J-A27012-20

2021 PA Super 47

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOSEPHE MURRAY | |
| Appellant | No. 151 EDA 2019 |

Appeal from the Judgment of Sentence Entered December 18, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0011145-2013

BEFORE:  STABILE, J., NICHOLS, J., and COLINS, J.[*]

OPINION BY STABILE, J.:                    **FILED:  MARCH 19, 2021**

Appellant, Josephe Murray, appeals from his judgment of sentence of life imprisonment plus 26-52 years' imprisonment for first-degree murder and related offenses.  Appellant's principal contention is that the trial court erred in denying his challenge to the prosecutor's use of peremptory strikes against two prospective jurors under ***Batson v. United States***, 476 U.S. 79 (1986). We hold that (1) Appellant failed to establish *prima facie* evidence of a ***Batson*** violation, (2) the prosecutor gave reasonable, race-neutral reasons for excluding both prospective jurors, and (3) the record does not establish that the prosecutor engaged in purposeful discrimination.  Accordingly, we affirm.

The victim, Thomas Watson, lived above a Häagen-Dazs ice cream store at 242 South Street in Philadelphia.  He worked across town as a DJ at the Copabanana Club at 40th and Spruce Streets.  At about 2:00 a.m. on May 11,

_____

[*] Retired Senior Judge assigned to the Superior Court.

2013, after finishing work at the Copabanana, Watson texted James Weisbrod, who drove an unlicensed cab in Philadelphia, and asked Weisbrod to pick him up. Weisbrod picked up Watson and another man, co-defendant Ronnie Robinson,[1] who worked as a security guard at the Copabanana. Weisbrod drove Robinson to an address in North Philadelphia. Weisbrod and Watson then stopped at a restaurant before driving to Watson's apartment. N.T. 10/10/18, at 94-97.

Weisbrod parked his Lincoln Town Car on American Street and then helped Watson unload his DJ equipment outside his apartment. The victim entered the closed Häagen-Dazs store, through which he had to walk in order to get to his second floor apartment. As Weisbrod was about to leave the area, he noticed that the victim had not moved his DJ equipment, which was still outside in the rain. Concerned, he returned to South Street and opened the door to the Häagen-Dazs store. Co-defendant Clarence Pone blocked Weisbrod's path and told him, "Get the fuck out of here." *Id.* at 98, 101-02.

Weisbrod got into his car, but instead of leaving the area, he circled the block and parked his car in front of the Häagen-Dazs store. When he heard two gunshots, Weisbrod got out of his car and walked into the store. As he entered, Appellant left the store. Weisbrod saw Watson lying on the ground behind the counter and called 911. *Id.* at 102-04.

_____

[1] Ronnie Robinson is also known as "Lonnie Robinson," but for purposes of this appeal we shall refer to him only as "Ronnie Robinson".

At approximately 3:00 a.m., Philadelphia Police Officers Corson and Duffy were on patrol when they received a radio call for a robbery in progress at the Häagen-Dazs store. The officers entered the store and discovered Watson's body behind the ice cream counter. Officer Corson observed wounds to Watson's chest and head. While on the premises, the officers noticed signs of a struggle and heard a cell phone ringing, but they could not locate the phone. *Id.* at 75-79; 10/11/18, at 25-28.

Philadelphia Police Officer Coleman also heard the radio call for the Häagen-Dazs store robbery and learned that the suspects were last seen running down American Street wearing dark clothing. As he drove north on American Street, he noticed a discarded black hoodie and glove lying on the sidewalk. Officer Coleman covered the items with a heavy paper bag to protect them from the elements and turned them over to a crime scene investigator. Forensic testing later demonstrated that Watson's DNA was on the upper back portion of the hoodie. N.T. 10/11/18, at 53, 65, 68; 10/22/18, at 208.

Police officers reviewed camera footage from inside and outside the Häagen-Dazs store depicting the final moments of Watson's life. The video showed that one hour before the murder, two vehicles, a Honda and a green Ford Explorer, parked along the 200 block of South Street, where the drivers and occupants waited until Weisbrod and Watson arrived in Weisbrod's vehicle. As Watson entered the store, two men followed him inside and one produced a large handgun. Watson struggled with the two men, who kicked

and beat him with the handgun. The video showed that Weisbrod attempted to enter the store but was stopped by an individual blocking his path. Watson was then shot. Weisbrod returned to the store, where a man with a bloodstained hoodie ran past him in the doorway and ran down the street. N.T, 10/11/18, at 159; 10/15/18, at 162-63, 168-79.

On May 12, 2013, one day after the shooting, Detective John Harkins recovered a Samsung TracFone (a pre-paid cellphone) from inside the store that had fallen underneath an ice cream machine. The officers submitted an exigent circumstances request for information to T-Mobile and learned that the phone had been shipped to a woman named Carmen Melton, who lived at 5718 Reedland Street. The officers reviewed the call logs to see if they could learn any information about the identities of individuals attempting to contact the phone. One telephone number was associated with a woman named Cheneka Jones, who lived at 5706 Reedland Street. The officers used a search database to determine who else was associated with that address. They saw a photo of Appellant and realized that he was one of the individuals in the video camera footage inside the Häagen-Dazs store. Detective Joseph Bamberski assembled a photo array that included Appellant's photograph and showed it to Weisbrod, who positively identified Appellant as the individual who had come to the door of the Häagen-Dazs store at the time of the shooting. N.T. 10/10/18, at 112, 116; 10/11/18, at 161-62; 10/15/18, at 81-87; 10/22/18, at 47.

- 4 -

Also on May 12, 2013, Detective Theodore Hagan interviewed Appellant's co-defendant, Ronnie Robinson, the man who rode with Watson in Weisbrod's car. Robinson told the detective that he had left the Copabanana Club after work with Watson, who dropped him off at his house in North Philadelphia at approximately 2:45 a.m. Robinson also told Detective Hagan that Watson had been in a fight with someone on South Street. N.T. 10/15/18, at 43, 44, 49, 56.

Meanwhile, detectives continued to examine call records from Appellant's cell phone and learned that he had been in communication sixteen times on the night of the murder with a phone registered to co-defendant Larry Nelson. N.T. 10/15/18, at 89.

Detective Bamberski prepared warrants to arrest Appellant and search his residence at 5706 Reedland Street. On the morning of May 15, 2013, Appellant was arrested at his home. Police officers recovered a pair of camouflage shorts that looked like the ones worn by the shooter in the video and proof of residency from the house. *Id.* at 90-92.

After receiving ***Miranda*** warnings, Appellant gave an inculpatory statement to Detective Bamberski (redacted for trial) in which he admitted shooting and killing Watson. Appellant explained that he owed a guy $5,000 for marijuana, so he agreed to rob the victim, who was known to have drugs in his apartment. Appellant and another person waited for the victim to arrive at the Haagen Daz store. When Weisbrod dropped the victim off at the store,

Appellant and another man ran to the store, grabbed the victim, and dragged him to the back of the store. Weisbrod returned to the store, but the other guy prevented him from entering the premises. Appellant, who was alone with the victim, hit him with his gun. Appellant asked him where the drugs were, but the victim continued to argue with him. Appellant got a call and was instructed to kill the victim. Appellant shot him in the head, ran out of the store, and discarded his hoodie and glove while he fled. He later met two of the other guys on 57th Street near Angora Terrace and returned the gun to one of the men. He also said that at the time of the shooting, he was using a TracFone he had purchased on the street. *Id.* at 98-119.

On the same day that Appellant was arrested, Detective Francis Graf picked up Ronnie Robinson at his home, told him the police had more questions for him, and brought him to the Homicide Division. Robinson gave a statement (redacted for trial) in which he said that he had met the victim, Watson, when they both worked together at the Copabanana Club. Robinson provided security for Watson and also picked up and dropped off money and drugs for him. Robinson stated that he knew the individual who was responsible for having Watson shot and killed. This individual came to the club on the night of the shooting and told Robinson that Watson possessed a lot of drugs, and they were going to get them that night. Robinson was instructed to call the guy and let him know what time Watson would be getting home. He also admitted that he knew the guy planned to rob Watson because

he had talked about doing it before in March. Robinson claimed he told the guy he did not want anything to do with the plan, but the guy told him he would pay Robinson for calling him to tell him Watson's whereabouts. N.T. 10/23/18, at 23, 25, 40-43.

Robinson further stated that on the night Watson was killed, he left the Copabanana Club with Watson in a cab. After the cab dropped him off, he received a call from the guy and told him that Watson was on his way home in a dark-colored Lincoln. The next day he read on Facebook that Watson had been killed. *Id.* at 43-44.

Larry Nelson also was arrested on May 15, 2013. Philadelphia Police Officer Hindley was instructed to look for Nelson in the area of the 5400 block of Angora Terrace. Officer Hindley noticed Nelson's 1997 Ford Explorer parked in the neighborhood, a vehicle that looked the same as one seen waiting outside the store on the surveillance video. Officer Hindley saw Nelson approach the vehicle and placed Nelson under arrest. Inside the car, police officers found Nelson's license and registration, as well as binoculars, black gloves and a box of ammunition. On Nelson's phone was information relating to Appellant's arrest and a news report of the victim's homicide. N.T. 10/22/18, at 6, 9-12, 26, 33-35; 10/23/18, at 112-19. On the morning of May 16, 2013, Nelson gave an inculpatory statement to Detective John Harkins. Nelson claimed that another guy had planned the robbery, and that his role was limited to introducing some of the participants to each other and

acting as a lookout. Nelson called someone to tell him Watson was on his way home and he stated that he was also supposed to notify the other guy when the robbery was complete. N.T. 10/22/18, at 57, 64-65.

On May 16, 2013, as detectives learned more about the shooting, they prepared a photographic array that included a photo of Pone and showed the array to Weisbrod. Weisbrod identified Pone as one of the two men he saw at the Häagen-Dazs store, and Detective Bamberski obtained an arrest warrant and warrant to search Pone's residence at 5622 Angora Terrace. The search warrant was executed on May 17, 2013. Inside Pone's house, police recovered a red Nike hat that resembled the hat worn by one of the men on the video, and proof of residence for Pone. N.T. 10/15/18, at 137-41.

Pone was arrested several days later, on June 4, 2013. He, too, gave an inculpatory statement admitting to his involvement in the killing of Thomas Watson. According to Pone, he was approached a few days before the shooting by a man who asked him if he wanted to make some quick cash. When he said that he did, the man told him to rough up the victim and take his money. A few nights later, the man picked up Pone and told him the plan was to go to the victim's house and steal his money and drugs. Pone said he and a few other men went to South Street and waited there until the victim arrived. Pone and another man went into the store, fought with the victim, and dragged him to the back of the store. The other guy pulled out a gun and they both roughed the victim up a bit. Pone then saw the victim's cab driver

return to Häagen-Dazs, so he intercepted him at the front door and prevented him from entering the store. Pone told the man to "get the fuck out of here" and followed him outside. Pone then went home. *Id.* at 143-55.

Appellant was arrested and charged with first-degree murder, robbery, criminal conspiracy, burglary, possession of an instrument of crime, and violations of the Uniform Firearms Act. Appellant and co-defendants Robinson, Nelson, and Pone jointly proceeded to a jury trial in the Court of Common Pleas of Philadelphia County. On October 26, 2018, the jury found Appellant guilty of first-degree murder, conspiracy to commit first-degree murder, robbery, conspiracy to commit robbery, burglary, possessing an instrument of crime, and violations of the Uniform Firearms Act. On December 18, 2018, the trial court imposed a mandatory sentence of life without the possibility of parole for Appellant's murder conviction and an additional 26 to 52 years' imprisonment for his remaining convictions. Appellant filed timely post-sentence motions on December 26, 2018, which the trial court summarily denied on December 27, 2018. This timely appeal followed.

The trial court did not direct Appellant to file a Statement of Matters Complained of on Appeal and did not file an opinion pursuant to Pa.R.A.P. 1925(b). According to the docket, the trial judge retired in early 2019.

Appellant raises the following issues in this appeal:

I. Did the trial court err when it determined that the Commonwealth did not improperly use its peremptory strikes in a discriminatory manner against African-American and Hispanic potential jurors during the jury selection process in violation of

Appellant's right to equal protection under ***Batson v. Kentucky***, 476 U.S. 79 (1986)?

II. Did the trial court abuse its discretion when it ruled that the defense was precluded from introducing evidence that a detective who was involved in the murder investigation was convicted of tampering with evidence or fabricating evidence for crimes that occurred shortly after Appellant's arrest?

III. Did the trial court err in admitting hearsay evidence, over Appellant's objection, that Appellant's girlfriend observed injuries to his face immediately after the shooting where Appellant's girlfriend did not testify at trial and the evidence was offered for the truth of the matter asserted?

IV. Did the trial court abuse its discretion when it refused to include an option to convict Appellant of conspiracy to commit third-degree murder on the verdict sheet where Appellant was charged with the crime of murder generally and the jury could have convicted him of third-degree murder as well as conspiracy to commit third-degree murder?

Appellant's Substituted Brief at 4.

Appellant first argues that the jury selection process in this case violated ***Batson***, because the Commonwealth exercised seven of its eight peremptory strikes to strike minority venirepersons, and the totality of the circumstances demonstrated that the prosecutor engaged in intentional racial discrimination. We disagree.

There were two full days of jury selection. The Commonwealth and the defense each were afforded eight peremptory strikes. N.T. 10/3/18, at 22. The Commonwealth exercised six peremptory strikes without objection. Five of these strikes were against African-Americans or Hispanic jurors; one was against a Caucasian.

The prosecutor used his seventh peremptory strike on an African-American female who worked as a security guard at a hospital and who previously had sat on a jury in a civil case. The prosecutor asked this juror the following questions:

Mr. Grenell: 10 years you worked in security?

Juror:      Yes.

Mr. Grenell: In 10 years, have you witnessed anyone committing any sort of crime whatsoever?

Juror:      No.

Mr, Grenell:  Never saw anyone at the hospital assaulted or been the victim of a crime in any way?

Juror:      I didn't actually see them.

Mr. Grenell:  You never had an opportunity, never been called to testify in any case based on something that happened at your hospital?

Juror:      Are you talking about in the hospital?  No.

N.T. 10/4/18, at 43-44.

After the prosecutor exercised his peremptory strike, Appellant's attorney made the following objection:

I would have a **Batson** motion regarding the last, almost all of the strikes, but in particular with the last three. The Commonwealth used seven of its strikes. They have all been of minorities except for one, which was strike number two, [C.M.]. [T.S.] was the last one of an African-American; [J.R.], which was Hispanic before that; [B.A.], which was an African-American female before that; [J.B.], was an African-American male before that; [R.B.], who was an African-American male before that; and then it was [C.M.], who was a white female; and [L.J.] was also a African-American woman. We do have seven jurors and there are only three

- 11 -

minorities out of the seven that have been seated. All, especially the last three, have given no indication they could not be fair. They were perfectly suitable jurors. The only reason they are being struck is they were African-American or minority. I think [the prosecutor] should put his race-neutral reasons on the record.

N.T. 10/4/18, at 45-46.

The prosecutor denied any pattern of discrimination and noted that the second, third, and fourth persons he agreed to have seated on the jury, at a time when he had several peremptory challenges to spare, were two African-American women and an African-American man. *Id.* at 47. He further noted that Appellant could not establish a pattern of discrimination without knowing the racial composition of the overall jury pool, since a pool composed predominantly of minorities would naturally tend to result in more strikes against minority venirepersons. *Id.* Appellant's attorney asserted that there were "significantly more white jurors available for selection than minorities," *id.* at 48, but counsel failed to provide any evidence in support of this claim. The court stated that it did not know if counsel's assertion was true. *Id.* at 48-49. Counsel responded that while she could provide this evidence, "I don't have to do that for this." *Id.* at 49. Instead, she insisted that there was a clear pattern of discrimination simply because the prosecutor had struck six minority venirepersons, the last three of which would had been "perfectly fine jurors." *Id.* The trial court replied to counsel, "I don't follow you to the end conclusion." *Id.* Nevertheless, the court asked the prosecutor to provide a race-neutral explanation for his strike. The prosecutor answered,

"[S]omebody who has worked for 10 years in security, 10 years, and has never seen a crime or known of a crime victim is either walking around with their eyes closed or not telling us the whole story. I just can't believe somebody in that particular position—" *Id.* at 50. The court accepted this as a race-neutral reason. *Id.*

The prosecutor used his eighth peremptory strike against a young African-American male[2] who testified that his older brother had been charged several years ago with attempted murder for "assaulting a kid that lived near me." *Id.* at 85. The victim of the assault was 18 or 19 years old. *Id.* The juror had lived in the Strawberry Mansion section of Philadelphia for one year, had never been a victim of or a witness to crime, and had never reported any crime to the police. *Id.* at 88-89.

When asked why he struck this juror, the prosecutor referred to his brother's charge of attempted murder, his youth, and the fact that "he is wearing like a fanny pack for an iced tea brand. It's the level of maturity he brings to a case like this." *Id.* at 92. The trial court accepted the prosecutor's explanation as race-neutral. *Id.*

The parties and trial court interviewed many other persons during *voir dire*, but the record does not mention the race of any juror other than those against whom the Commonwealth exercised peremptory strikes.

_____

[2] Although the record does not identify the juror's age, it establishes that he recently graduated high school.

- 13 -

"A ***Batson*** claim presents mixed questions of law and fact." ***Commonwealth v. Scott***, 212 A.3d 1094, 1105 (Pa. Super. 2019). Therefore, our standard of review is whether the trial court's legal conclusions are correct and whether its factual findings are clearly erroneous. ***Id.*** The ultimate burden of persuasion regarding racial motivation rests with the opponent of the strike. ***Commonwealth v. Cook***, 952 A.2d 594, 602 (Pa. 2008).

"In ***Batson***, the United States Supreme Court held that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the United States Constitution." ***Commonwealth v. Reid***, 99 A.3d 470, 484 (Pa. 2014). The Supreme Court subsequently amplified ***Batson*** by holding that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races." ***Powers v. Ohio***, 499 U.S. 400, 402 (1991).[3]

> When a defendant makes a ***Batson*** challenge during jury selection:
>
> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate

_____

[3] In this case, for example, Appellant objected to exclusion of jurors belonging to the same race as him (African-American) and to a different race (Hispanic). Under ***Powers***, it was permissible for Appellant to object to the exclusion of both African-Americans and Hispanics.

- 14 -

determination of whether the defense has carried its burden of proving purposeful discrimination.

*Commonwealth v. Thompson*, 106 A.3d 742, 751 (Pa. Super. 2014). The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent. *Commonwealth v. Williams*, 980 A.2d 510, 531 (Pa. 2009). This Court must give great deference to the trial court's determination that peremptory challenges were free of discriminatory intent, and we will not overturn the determination unless it was clearly erroneous. *Id.* "Such great deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Id.* "Moreover, there will seldom be much evidence on the decisive question of whether the race-neutral explanation for a peremptory challenge should be believed; the best evidence often will be the demeanor of the prosecutor who exercises the challenge." *Id.*

The defendant does not satisfy *Batson's* first step of *prima facie* evidence merely by showing that the prosecutor used a number of strikes against venirepersons of one race. *Thompson*, 106 A.3d at 751. Nor is it sufficient to merely point out the fact that the prosecutor rejected a higher percentage of African–American potential jurors than non-African-American potential jurors. *Commonwealth v. Roney*, 79 A.3d 595, 620–21 (2013) (prosecutor's use of peremptory challenges to strike thirteen out of nineteen African–American venirepersons, but only four out of twenty-four non-African-

- 15 -

American venirepersons, was inadequate to establish *prima facie* case of discrimination).  Instead, the defendant must preserve a "full and complete record of the asserted **Batson** violation, as it would otherwise be impossible to conduct meaningful appellate review of the motivations of prosecutors in individual cases without such a record."  **Thompson**, 106 A.3d at 751-52.

Within the *prima facie* case wherein a defendant must establish on the record the circumstances demonstrating purposeful discrimination, Pennsylvania law also requires that a defendant must make a record specifically identifying (1) the race or gender of all venirepersons in the jury pools, (2) the race or gender of all venirepersons remaining after challenges for cause, (3) the race or gender of those removed by the prosecutor, and (4) the race or gender of the jurors who served and the race or gender of jurors acceptable to the Commonwealth who were stricken by the defense. **Commonwealth v. Hill**, 727 A.2d 578, 582 (Pa. Super. 1999).

In other words, for a **Batson** claim to be in a posture for the trial court to make a proper ruling, the following must happen.  First, a defendant must make out a *prima facie* case on the record to the trial court.  The *prima facie* case requires more than just noting on the record the race of excluded jurors and the numerical composition of the prosecution's strikes. The *prima facie* case must be detailed enough for the trial court eventually to assess whether there has been purposeful discrimination to establish a **Batson** violation.  The *prima facie* case must identify the circumstances a defendant believes

establishes purposeful discrimination, including those record items required under Pennsylvania law. *Hill.* Second, once a defendant qualifies the record with a sufficient *prima facie* case, the prosecution is then obligated to provide race-neutral explanations for the strikes being questioned. Finally, once the record is complete with a defendant's *prima facie* case and the prosecution's race neutral explanations, the trial court has a proper foundation to proceed to the third step, in which it assesses the totality of the circumstances surrounding juror selection and determines whether the defendant has made out a case of purposeful discrimination. As we will now discuss, Appellant's *Batson* challenge fell short on the record of establishing purposeful discrimination.

Appellant contends that the prosecutor harbored discriminatory intent against African-Americans and Hispanics because out of eight peremptory strikes, he used six against African-Americans and one against a Hispanic. N.T. 10/4/18, at 45-46, 92. As stated however, mere reference alone to the use of strikes against venirepersons of one race is not sufficient to set forth a *prima facie* case of purposeful discrimination. *Thompson*. Moreover, the record does not include those Pennsylvania specific criteria necessary to a *prima facie* case. While the record includes transcripts of the two days of jury selection, the transcripts divulge the race of only the venirepersons against whom the prosecutor exercised peremptory strikes. The record does not identify the race of (1) the jurors who served, (2) the jurors acceptable to the

Commonwealth who were stricken by Appellant's counsel, (3) the venirepersons in the jury pools, or (4) the venirepersons remaining after challenges for cause.[4] Without at least these facts, it is "impossible to conduct meaningful appellate review" of the prosecutor's motivations. *Thompson*, 106 A.3d at 751; *see also id.* at 752 ("[w]hen a movant fails to make such a record, we cannot review the trial court's determination that a movant failed to establish a *prima facie* case under *Batson*").

Appellant attempts to excuse his failure to make a record by insisting that he had no duty to do so, N.T. 10/4/18, at 49, and that in any event, the trial court implicitly ruled that he satisfied the *prima facie* hurdle by proceeding to a second-step *Batson* analysis (whether the prosecutor had a race-neutral reason for his seventh and eighth strikes). We disagree. Defense counsel has a duty to create a "full and complete" record of an alleged *Batson* violation. *Thompson*, 106 A.3d at 751. Even though the trial court requested a race-neutral explanation, this does not excuse the fact that the first-step record was incomplete for the reasons provided above. Furthermore, the trial court did not find that Appellant satisfied the *prima facie* standard. In response to Appellant's first *Batson* challenge, the trial court said, "I don't follow you to the end conclusion," N.T. 10/4/18, at 49, but then requested a race-neutral explanation. In response to the second *Batson* challenge, the trial court said

---

[4] Nor does Appellant allege anything about these subjects in his brief.

to defense counsel, "I got your point," *id.* at 90, and requested a race-neutral explanation. After the explanation, the court stated that Appellant's challenge was in "good faith" but declared the prosecutor's rationale race-neutral. *Id.* at 92. At most, the trial court's statements indicate that it was noncommittal on the *prima facie* question, not that it actually found a *prima facie* claim— and as discussed above, the record was insufficient to permit such a finding.

The law is not entirely consistent as to whether a court may proceed to the second-step *Batson* analysis when a defendant has failed to make out a *prima facie* case. Our Supreme Court has indicated several times that we should proceed no further. *See Commonwealth v. Watkins*, 108 A.3d 692, 708 (Pa. 2014) (burden shifts to the prosecutor to articulate a race-neutral explanation "if the *prima facie* showing is made") (citing *Cook*, 952 A.2d at 602). On the other hand, in *Commonwealth v. Sanchez*, 36 A.3d 24 (Pa. 2011), the trial court did not address the first prong of the *Batson* test and focused instead on the second prong. Although the Commonwealth argued in the Supreme Court that the appellant did not meet the first prong, the Court announced it would not decide this issue. Instead, the Court recognized that the United States Supreme Court has suggested that, under these circumstances, "we may turn directly to the question of whether the appellant had carried his burden of proving that the prosecution had struck the juror based on race." *Id.* at 45 (citations and quotation marks omitted). The *Sanchez* Court opted to "take the same approach" and address the second

and third prongs. ***Id.*** We believe, given the inconsistency on this subject, that the safer course of action here as well, is to proceed to review ***Batson***'s second and third prongs.

In the second-step ***Batson*** analysis, we determine whether the Commonwealth gave a race-neutral explanation for its challenge. This inquiry does not demand an explanation that is "persuasive, or even plausible." ***Cook***, 952 A.2d at 602 (citing ***Purkett v. Elem***, 514 U.S. 765, 767 (1995)). Instead, the issue is "the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." ***Id.*** (citing ***Hernandez v. New York***, 500 U.S. 352, 360 (1991)).

Courts have upheld a variety of reasons for peremptory challenges as race-neutral. ***See Purkett***, 514 U.S at 769 ("The prosecutor's proffered explanation in this case--that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard--is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike. The wearing of beards is not a characteristic that is peculiar to any race. And neither is the growing of long, unkempt hair. Thus, the inquiry properly proceeded to step three, where the state court found that the prosecutor was not motivated by discriminatory intent"); ***Commonwealth v. Bond***, 652 A.2d 308, 313 (Pa. 1995) (prosecutor stated that juror's demeanor clearly indicated she did not want to be on jury and did not relate well to

prosecutor); ***Alexander v. Carlisle Corp.***, 674 A.2d 268, 270 (Pa. Super. 1996) ("One juror was stricken for lack of respect for the jury selection process, who wore sunglasses throughout the entire selection process").

More recently, in ***Commonwealth v. Scott***, 212 A.3d 1094 (Pa. Super. 2019), as reasons for striking four African-American jurors, the prosecutor explained that one had attenuated residency in Philadelphia, another worked for a prison and assessed inmates' medical needs and health issues, a third engaged in unusual staring at the prosecutor even while others were asking him questions, and a fourth exhibited young age and immature manner. ***Id.*** at 1106. This Court held that the Commonwealth provided "plausible, race-neutral explanations for each peremptory challenge." ***Id.***

In this case, the prosecutor exercised his seventh strike on a hospital security guard because he doubted her claim that she never saw a crime in ten years of security work. He stated, "[S]omebody who has worked for 10 years in security . . . and has never seen a crime or known of a crime victim is either walking around with their eyes closed or not telling us the whole story." N.T. 10/4/18, at 50. This argument finds support in the record from the security guard's testimony:

Mr. Grenell: 10 years you worked in security?

Juror:      Yes.

Mr. Grenell: In 10 years, have you witnessed anyone committing any sort of crime whatsoever?

Juror:      No.

N.T. 10/4/18, at 43-44. The prosecutor exercised his eighth strike because the juror was young, his brother had been charged with attempted murder, and his attire (wearing "like a fanny pack for an iced tea brand") suggested a lack of maturity. *Id.* at 92. The Commonwealth's explanations for these two strikes are as plausible and race-neutral as the explanations found race-neutral in the aforementioned decisions.

We now examine the third and final step of the *Batson* analysis; once the trial court finds that the prosecutor's explanation for a peremptory strike is race-neutral, it may address whether the defendant has carried his burden of proving purposeful discrimination considering all the circumstances. *Williams*, 980 A.2d at 530. We accord great deference to the trial court's determination and overturn it only for clear error. *Id.* Based on the record in this case, the trial court acted within its discretion in not finding purposeful discrimination.

Appellant complains that the prosecutor misconstrued the security guard as testifying that she never witnessed criminal conduct during her ten years as a security guard, when in fact the security guard merely testified that she had never seen criminal conduct for ten years *at the hospital where she worked*. Appellant's Brief at 25-26. This misconstruction, Appellant argues, was a pretext; intentional discrimination was the real reason for the peremptory strike against the security guard. *Id.* In addition, Appellant argues that the prosecutor's reasons for striking the young male juror (his

youth and attire and the charge of attempted murder against his brother) were subterfuges for the prosecutor's "preconceived notions about the juror's experiences as a minority living in an impoverished area of the city." Appellant's Brief at 29. Aside from suggesting that the prosecutor's reasons were subterfuge or pretext, Appellant points to nothing in the record that would corroborate or support his position, other than the number of peremptory strikes against African-Americans and Hispanics (seven) versus the number of peremptory strikes against Caucasians (one) as evidence of purposeful discrimination. Appellant cannot merely offer speculation about motive to prevail on a *Batson* claim; he must be able to point to evidence in the record to corroborate his impressions. Appellant has not done so. He relies upon an insufficient record that does nothing more than establish the number of peremptory strikes exercised against persons of particular races. Standing alone, this fact does not establish purposeful discrimination. *See Commonwealth v. Ligons*, 971 A.2d 1125, 1144 (Pa. 2009) ("While it is clear that the prosecutor peremptorily struck more African–Americans than Caucasians, this fact, in and of itself, is insufficient to demonstrate purposeful discrimination when considering the totality of the circumstances").

The decision heavily relied upon by Appellant, *Commonwealth v. Edwards*, 177 A.3d 963 (Pa. Super. 2018), does not control the outcome of the present case. During *voir dire* in *Edwards*, the trial court's staff placed the race and gender of each prospective juror on a juror strike sheet before

handing the sheet to counsel. The defendant objected to this process, and the trial court overruled the objection. The parties considered 30 potential jurors, of whom 13 were African-American. The Commonwealth used seven of its eight peremptory strikes on African-Americans. An additional 14 potential jurors were Caucasian, but the Commonwealth did not strike any of them. Finally, three of the potential jurors were neither Caucasian nor African-American. The Commonwealth exercised its last peremptory strike on one of those three individuals. Once the parties exercised their respective peremptory strikes, Appellant raised a *Batson* objection to the Commonwealth striking four prospective African–American jurors. The trial court overruled Appellant's objection.

In a divided decision, this Court held that the defendant's *Batson* argument was meritorious. The majority determined that the defendant raised a valid *prima facie* case, because

> Appellant is African–American and the Commonwealth struck seven African-American prospective jurors. Furthermore, although listing the races and gender of prospective jurors on the peremptory strike sheet did not qualify as a *per se* *Batson* violation, it is a relevant circumstance that raised an inference that the prosecutor struck the jurors based on their race.

*Id.* at 972-73. The majority then concluded that the Commonwealth provided race-neutral reasons for striking each juror.

Next, the majority noted that the trial court did not explicitly rule that the defendant failed to prove discriminatory intent, but it stated that "the trial court's denial of [the defendant's] *Batson* challenge, along with the reasoning

- 24 -

in its Rule 1925(a) opinion, . . . indicates that [it] implicitly found that [the defendant] failed to prove purposeful discrimination." *Id.* at 974. The majority then held that three factors demonstrated discriminatory intent. First, "the identification of the race and gender of the potential jurors on the peremptory strike sheet, [while] not a *per se* **Batson** violation, when combined with the other factors listed below . . . supports an inference of racial discrimination." *Id.* at 975. Second,

> [t]he statistics in this case are startling. Unlike many cases addressed by our Supreme Court, in this case the Commonwealth exercised all eight of its peremptory strikes on racial minorities and seven of those eight on African–Americans. Although the Commonwealth could not completely purge the jury in this case of African–Americans because of the number of African–American members of the venire, the Commonwealth greatly reduced the number of African–Americans on the jury in this case by exercising all of its peremptory strikes and using seven of those eight strikes on African–Americans[.]

*Id.* at 975-76. Finally,

> the most important factor when considering the totality of the circumstances is the race explanation offered by the Commonwealth. . . . Essentially, the Commonwealth stated that it struck Juror 67 because she did not seem pleased to be called to jury duty. Although . . . this was a facially race-neutral explanation, this same rationale could be used to strike almost every potential juror in almost every case tried throughout Pennsylvania. Few (if any) citizens are thrilled when they receive a jury summons in the mail. Instead, they begrudgingly arrive at the courthouse to fulfill their civic duty (or avoid being arrested). The trial court acknowledged this reality twice during the jury selection process in this case.
>
> The Commonwealth also stated that Juror 67 was leaning back in her chair with her arms crossed during the voir dire process. This, however, was encouraged by the trial court at the beginning of jury selection [when it said, "So sit back and relax"]. There is no

assertion that she was disruptive, that she ignored the trial court's instructions, or that she exhibited outward or palpable disinclination to discharge her duties as an impartial factfinder.

*Id.* at 976.

We consider *Edwards* distinguishable in several respects. Unlike in *Edwards*, there is no juror strike sheet in the record of this case.[5] While the *Edwards* majority found the jury statistics "startling," in the present case, Appellant failed to provide critical data relating to the composition of the jury and venire panel. The only data that the record reveals is that the prosecutor struck more minority jurors (seven) than Caucasian jurors (one), a fact that alone does not demonstrate discriminatory intent. Further, unlike this case, the prosecutor in *Edwards* did not strike any Caucasian jurors at all, whereas one of the prosecutor's first strikes in this case was against a Caucasian. N.T. 10/4/18, at 45-46. Finally, while the *Edwards* majority held that the prosecutor's reason for striking Juror 67 was pretextual, the trial judge in the present case did not conclude the prosecutor's seventh or eighth peremptory strikes were pretextual, and the record herein does not support a finding of pretext due to the omission of important *prima facie* evidence and evidence of the prosecutor's demeanor or motives.

_____

[5] In addition, although we are not required to do so, we have searched the records in the appeals of co-defendants Nelson, Robinson, and Pone, but we have not found the strike sheet in these records.

- 26 -

In short, Appellant failed to demonstrate *prime facie* evidence of a **Batson** violation, the Commonwealth provided the trial court with plausible and race-neutral explanations for each peremptory challenge, and the omission of critical evidence from the record defeats Appellant's claim of pretext or purposeful discrimination. Appellant's **Batson** argument merits no relief.

In his next argument, Appellant posits that the trial court abused its discretion by precluding him from introducing evidence that Detective Dove, a detective involved in the investigation underlying this case, was convicted of tampering with or fabricating evidence in an unrelated homicide investigation. We hold that the trial court properly excluded this evidence.

Joseph Bamberski, an officer with eighteen years' experience, was selected as the assigned detective for the case. N.T. 10/9/18, at 17-18. On May 13, 2013, he executed a search warrant at Appellant's residence at 5706 Reedland Street, along with three fellow officers, Detective Burns, Detective Harkins, and Detective Dove. N.T. 10/17/18, at 49. During this search, the officers recovered a pair of camouflage shorts that resembled clothing Appellant was seen wearing in the surveillance video while attacking Watson. Detective Bamberski stored the shorts in a drawer under his control in the Homicide Unit and produced them prior to trial. N.T. 10/9/18, at 22-25, 32-33. A few days later, Detective Bamberski executed a separate warrant at the home of co-defendant Pone and recovered two letters providing proof of

Pone's residency and a Nike hat that resembled clothing Pone was seen wearing in the surveillance video while attacking the victim. Afterward, while filling out paperwork, Detective Dove accidently wrote "one red Nike hat" and "two letters" in the property seized section on the face of the warrant for Appellant's house instead of Pone's house. When Detective Bamberski pointed out the error, Detective Dove crossed out what he had written. *Id.* at 27-32.

The following year, Detective Dove became personally involved in an unrelated homicide matter in which his girlfriend was the principal suspect. In an effort to protect her, he hid evidence implicating her and lied to the police. In 2017, he pled guilty to charges including hindering apprehension, tampering with evidence, and unsworn falsification to authorities. *Id.* at 5-7.

Several months before trial, Appellant filed a motion for leave to introduce evidence of Detective Dove's arrest. The trial court denied Appellant's motion and, when Appellant renewed this motion at the beginning of trial, denied it again. During Appellant's trial, neither the Commonwealth nor the defense called Detective Dove as a witness. Instead, the Commonwealth called thirteen other officers, including Detective Bamberski, who was subject to lengthy cross-examination. N.T. 10/15/18, at 75-182; 10/16/18, at 8-177; 10/17/18, at 6-71, 77-78; 10/22/18, at 106-16.

Appellant argued that he should have been allowed to introduce evidence of Detective Dove's misconduct. He argues that doing so would have

supported his claim that Detective Dove "planted" the camouflage shorts retrieved from his house. Appellant's Brief at 36.

"[A] motion *in limine* is a procedure for obtaining a ruling on the admissibility of evidence prior to trial . . ." ***Commonwealth v. Rosen***, 42 A.3d 988, 994 (Pa. 2006). When reviewing the denial of a motion in *limine*, we apply an evidentiary abuse of discretion standard. ***Id.*** The admission of evidence is committed to the sound discretion of the trial court, and our review is for an abuse of discretion. ***Id.***

Pennsylvania's Rules of Evidence provide that evidence of a crime, wrong, or other act may be admissible to prove a person's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," but "[i]n a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). In criminal cases where defendants attempt to impeach police witnesses with evidence of their prior misconduct, Pennsylvania courts have balanced the scales between probative and prejudicial evidence as follows:

> The pertinent case law permits a police witness to be cross-examined about misconduct as long as the wrongdoing is in some way related to the defendant's underlying criminal charges and establishes a motive to fabricate. ***Commonwealth v. Peetros***, [] 535 A.2d 1026 ([Pa.] 1987) (police witness had been demoted after it was discovered he repeatedly took bribes; defendant was improperly restricted from impeaching him with this evidence since it bolstered entrapment defense in defendant's bribery prosecution); ***Commonwealth v. Dawson***, [] 405 A.2d 1230 ([Pa.] 1979) (police officer was under investigation at trial and

- 29 -

had been demoted for beating defendant's co-defendant; defendant should have been permitted to question officer about the matter since it provided officer with motive to obtain conviction against defendant as well as to fabricate fact that defendant had confessed); *Commonwealth v. Sullivan*, [] 402 A.2d 1019 ([Pa.] 1979) (police witness faced suspension based upon outcome at defendant's trial and defendant should have been allowed to explore that matter at his trial); *Commonwealth v. Shands*, [] 487 A.2d 973 ([Pa. Super.] 1985) (defendant awarded new trial because he had not been permitted to impeach officer with fact that he was part of group of police officers who were racially biased, made false arrests, and perjured themselves in criminal prosecutions).

However, if the prior police behavior is unrelated to the present matter and irrelevant, the trial court is permitted to restrict questioning on the prior incident. *Commonwealth v. Boczkowski*, [] 846 A.2d 75 ([Pa.] 2004) (fact that police witness withheld evidence in prior case was not relevant because there was no evidence of withholding evidence in case at hand); *Commonwealth v. Bright*, [] 420 A.2d 714 ([Pa. Super.] 1980) (defendant could not impeach police officer with potential disciplinary action for excessive use of force by different officer since that cross-examination had no relationship to case in question); *see also Commonwealth v. Guilford*, 861 A.2d 365, 369 (Pa. Super. 2004) (quoting *Bright*, *supra* at 716) ("a witness may not be contradicted on 'collateral' matters, . . . and a collateral matter is one which has no relationship to the case at trial.").

*Commonwealth v. Bozyk*, 987 A.2d 753, 757 (Pa. 2009).

We find the trial court properly excluded evidence of Detective Dove's misconduct under Rule 404(b)(2). The Commonwealth proved its case through, *inter alia*, thirteen police witnesses other than Detective Dove. Neither the Commonwealth nor the defendants asked Detective Dove to testify. Furthermore, the execution of the search warrants at Appellant's and Pone's residences took place in May 2013. Detective Dove's crimes took place

approximately one year later in a completely unrelated homicide investigation involving his girlfriend. There is no evidence in the present case that Detective Dove was romantically involved with the victim's murderer or that he sought to conceal inculpatory evidence, as he later did to protect his girlfriend in the unrelated case. Under these circumstances, this evidence had limited probative value (if any), and its potential for prejudice outweighed its probative value.

The decisions cited by Appellant in support of his argument, **Shands** and **Peetros**, are inapposite for several reasons. Unlike Detective Dove, the police officers who engaged in misconduct in **Shands** and **Peetros** actually testified against the defendants at trial, and their misconduct took place either before or contemporaneous with the defendant's arrest. In addition, evidence of the officers' misconduct had probative value for the defense. In **Shands**, the defendant was accused of attempting to steal money from an undercover officer disguised as an aged derelict. The officers who testified against the defendant had a stake in the outcome of his trial, because they were under investigation for assaulting and framing other suspects while disguised as elderly derelicts. In **Peetros**, a bribery case, the officer who testified against the defendant had been demoted for participating in prior bribery schemes, a fact that enhanced the defendant's claim of entrapment. None of these characteristics are present here.

In his third argument, Appellant maintains that the trial court erred by permitting Detective Bamberski, an investigator in this case, to testify about a hearsay statement by Appellant's girlfriend. Although this evidence was inadmissible hearsay, we conclude that its admission was harmless error.

The evidence demonstrates that the victim fought his assailants while they dragged him through the ice cream shop. Appellant's attorney questioned Detective Bamberski about his observations of Appellant's physical appearance at the time of his arrest on the morning of May 15, 2013. Detective Bamberski testified that he had the opportunity to observe Appellant at that time and did not see any scratches or injuries on Appellant's face, head, or legs. N.T. 10/17/18, at 71. On re-direct examination, over Appellant's objection, the prosecutor asked Detective Bamberski about a statement Cheneka Jones, Appellant's girlfriend, had made. The court permitted the detective to read the following excerpt from Jones' statement into the record:

> **Question:** When [Appellant] came home on Saturday morning, four a.m. on 5/11/13, did he tell you where he was at or had been?
>
> **Answer:** No. He never told me where he was. He just said that he was in a fight. That's it. I kind of knew that by the bump under his eye.

N.T. 10/17/18, at 74.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted therein. Pa.R.E. 801(c). Hearsay is generally inadmissible unless it falls within an exception to the hearsay prohibition. *Commonwealth*

*v. Housman*, 226 A.3d 1249, 1263 (Pa. 2020). Jones' statement clearly was hearsay. We do not see any exception under which this statement was admissible; nor does the Commonwealth argue that any exception applies.

Instead, the Commonwealth contends that the admission of this statement was harmless error. We agree. Under the harmless error doctrine, we must vacate the order on review to correct the error unless we are "convinced beyond a reasonable doubt that the error is harmless." *Commonwealth v. Story*, 383 A.2d 155, 162 (Pa. 1978). We may consider error harmless only where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Taylor*, 209 A.3d 444, 450 (Pa. Super. 2019). "Harmless error exists where the appellate court is convinced beyond a reasonable doubt that the erroneously admitted evidence could not have contributed to the verdict. If there is a reasonable probability that an error may have contributed to the verdict, the error is not harmless." *Id.*

The proof of Appellant's guilt was overwhelming. He was caught on surveillance video fighting with the victim; he was seen by an eyewitness leaving the scene of the crime; he confessed to the murder; the cell phone with which he communicated with his co-conspirators was recovered from the

scene; and his co-conspirators likewise confessed, including Pone, who named Appellant in his statement and identified him in open court. N.T. 10/10/18, at 102, 116; 10/11/18, at 165-76; 10/15/18, at 109-23; 10/17/18, at 59-60; 10/24/18, at 70-80, 138-45. Indeed, the evidence was so abundant that the prosecutor did not even bother to refer to Jones' remark in his closing argument. N.T. 10/25/18, at 105-59. Thus, the admission of Jones' statement was harmless error, and no relief is warranted.

Lastly, Appellant argues that the trial court erred by refusing to include an option on the verdict sheet for the jury to convict Appellant of conspiracy to commit third degree murder. We again conclude no relief is due.

Appellant was charged with one count of murder generally, conspiracy to commit robbery, conspiracy to commit first-degree murder, robbery, burglary, carrying a firearm without a license, carrying a firearm on a public street, and possessing an instrument of crime. The court instructed the jury on the elements of conspiracy and, more particularly, the elements of conspiracy to commit first-degree murder. N.T. 10/26/18, at 39-40. The court also instructed the jury as to the various degrees of murder and said, with respect to Appellant, that the jury could reach four possible verdicts in the victim's death by homicide: not guilty; guilty of first-degree murder; guilty of second-degree murder; or guilty of third-degree murder. N.T. 10/26/18, at 41. At the conclusion of the instructions, Appellant's attorney asked the Court to include on the verdict sheet an option to convict him of conspiracy to

commit third-degree murder in light of the decision in **Commonwealth v. Fisher**, 80 A.3d 1186 (Pa. 2013), that conspiracy to commit third-degree murder is a cognizable offense. **Id.** at 61. Counsel stated, however, that she "was not asking for any further instruction." **Id.** The court declined to include the lesser conspiracy charge on the verdict sheet. **Id.** Based on this decision, Appellant requests a new trial. Appellant's Brief at 53.

The trial court correctly denied Appellant's request to include conspiracy to commit third-degree murder on the verdict sheet without a request also to instruct the jury on the elements of this offense. We review challenges to verdict sheets for abuse of discretion. **Commonwealth v. Selenski**, 18 A.3d 1229, 1235 (Pa. Super. 2011), *reversed on different grounds*, 100 A.3d 206 (Pa. 2014). Appellant does not cite any authority, nor are we aware of any, that permits the addition of a new charge to a verdict slip without a jury having been charged on that separate crime. Adding a new charge to the verdict sheet without instructing the jury on this charge would likely have confused the jury in what was already a highly complex case involving four persons on trial and numerous criminal charges. We find no abuse of discretion in the trial court's refusal to include the charge on the verdict slip.

For these reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judge Colins joins the opinion.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/19/21