J-A20036-25

2025 PA Super 284

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                           :            PENNSYLVANIA
                                           :
                                           :
               v.                             :
                                         :
                                         :
THOMAS REYES                        :
                                         :
             Appellant                :   No. 1307 EDA 2024

Appeal from the Judgment of Sentence Entered April 19, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000146-2022

BEFORE: MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY FORD ELLIOTT, P.J.E.:          **FILED DECEMBER 22, 2025**

     Appellant, Thomas Reyes, appeals from the judgment of sentence imposed following his conviction by a jury of unlawful contact with a minor – sexual offenses ("UCM").[1] Appellant raises five distinct claims, two challenges to the sufficiency of the evidence, and challenges to the court's decision to give a deadlocked jury a ***Spencer***[2] charge, its calculation of his prior record score ("PRS") and designation of him as a sexually violent predator ("SVP"). We affirm the conviction but vacate the sentence because it was beyond the statutory maximum and remand for resentencing.

     The trial court accurately sets out the factual record, as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The text of 18 Pa.C.S. § 6318(a)(1), at the time of the offense and trial, has since been changed renumbered as 18 Pa.C.S. § 6318(a)(1.2).

[2] ***Commonwealth v. Spencer***, 275 A.2d 299 (Pa. 1971).

On September 2, 2021, the complainant, 15-year-old … C.S.[], was at [the home of her boyfriend]. She and [her boyfriend] got into an argument, and [he] hit C.S. [The boyfriend's] mother returned home sometime around 7:00 pm. When [the] mother saw bruises on C.S., she became upset with [her son] and called her brother, … Appellant…, to come over. Appellant arrived at the house around 8:45 pm. Appellant did not speak to C.S. at this point.

Soon after, [the] mother decided that C.S. should go home. She told C.S. that Appellant would drive C.S. home. When they got to Appellant's car, C.S. opened the back door to get into the back seat. Appellant told her not to sit in the back seat because there was stuff back there and it was messy. C.S. did not see anything on the back seat. She thought it was "weird" that Appellant wanted her to sit up front, but she did so anyway.

C.S.'s house was about ten minutes away from [her boyfriend's] house by car. Appellant drove unusually slowly, and the drive took fifteen-to-twenty minutes. While they were driving, Appellant asked C.S. questions about herself and her relationship with [his nephew], including why she stayed with [him] when he mistreated her, and whether C.S. was dating anyone else.

At some point during the drive, Appellant put his hand on C.S.'s thigh. C.S. initially took this as an attempt to comfort her after her fight with [the boyfriend], but soon pushed his hand away. Neither of them commented on him touching her leg or her pushing his hand away.

At approximately 9:30 [p.m.], they arrived at C.S.'s block. Instead of continuing all the way to C.S.'s house, Appellant stopped near the corner, one or two houses away. At this point, he put his hand on her thigh again. He continued asking "random," non-sexual questions about her and [her boyfriend] and school. C.S. moved closer to the car door to try to get away. Appellant moved his hand up her thigh, under her sweatpants, and began to rub C.S.'s vagina, first over her underwear, then under. He put his fingers inside her vagina.

While this was happening, Appellant used his other hand to unbuckle his belt and pull his pants down. Appellant then grabbed C.S.'s hand and placed it on his penis. She pulled her hand away and sat on it. Appellant then suggested he drive C.S. back to his house instead of her house. She declined the suggestion. Then he

grabbed her hand and placed it on his penis again, making her stroke it up and down.

At approximately 10:00 [p.m.], C.S. told Appellant she really had to go inside. Appellant let C.S. out of the car and accompanied her to her house. C.S. went upstairs to her room without telling anybody what happened.

C.S. told [her boyfriend] about the incident on the following day, September 3, 2021. Later that day, C.S. told her father. That evening, the incident was reported to police. On October 14, 2021, she was interviewed at the Philadelphia Children's Alliance ["PCA"].

Opinion, Lightsey, J., 9/18/24 ("Trial Court Opinion"), 5-7 (internal record citations omitted).

On November 12, 2021, Appellant was arrested and charged with aggravated indecent assault, indecent assault, unlawful restraint, corruption of minors, and UCM. The introduction of evidence at the jury trial commenced September 19, 2023. The complainant testified as described above.

On cross[-examination], Appellant elicited answers from C.S. that were facially inconsistent with her testimony on direct [examination] and at the PCA interview. She appeared to agree that there were things in the back seat of the car. She said Appellant had used both hands to take off his own pants, instead of just one. She appeared to agree that they were parked on the street for about an hour, instead of a half-hour. On direct, she did not mention attempting to open the car door; while in the PCA interview and on cross she said she attempted to open the car door but was unable to. C.S. also acknowledged that when she spoke to police the day after the incident, she did not mention that Appellant took his pants off, or that he made her touch his penis. During the charging conference on September 19, 2023, the court rejected the prior inconsistent statement charge proffered by defense.

Trial Court Opinion, 7 (internal citations to the record omitted).

While the jury was deliberating on September 20, 2023, it asked the court, "[D]oes the decision of guilty or non-guilty on indecent or aggravated assault affect the decision on unlawful contact?" N.T. Trial, 9/20/23, 17. The trial court initially "answered '[Y]es,' but corrected itself the next day in conformity with the law and informed the jurors that the correct answer is '[N]o.'" Trial Court Opinion, 7; *see also* N.T. Trial, 9/20/23, 26; N.T. Trial, 9/21/23, 9. In between answering yes to the question, and correcting itself the next day by answering no to the question, the trial court read the jury a *Spencer* charge when it reported it was "unable to come to consensus … on two of four charges." N.T. Trial, 9/20/23, 26, 28-30. The jury returned its verdict on September 21, 2023, finding Appellant guilty of UCM, and not guilty of aggravated indecent assault, corruption of a minor, and indecent assault of a person less than 16 years of age. N.T. Trial, 9/21/23, 11-12.

On April 19, 2024, the trial court imposed a term of two to five years' incarceration followed by three years' probation. *See* Sentencing Order, 4/22/24, 1. The court also designated Appellant to be a sexually violent predator, making him subject to lifetime registration. *See id.*, 2.

Appellant filed a timely post-sentence motion. *See* Appellant's Post-Sentence Motion, 4/22/24. Relevant to this appeal, he requested relief on the grounds that "the evidence was insufficient to support a conviction for unlawful contact," … "the jury instructions and interrogatories, which occurred after the jury received a *Spencer* charge improperly influenced the jury's deliberations," the prior record score was erroneously calculated and his

sexually violent predator designation was erroneously determined. *Id.*, 2. The trial court denied the post-sentence motion. Order, 4/24/25 (denying post-sentence motion).

Appellant timely filed an appeal. *See* Appellant's Notice of Appeal, 5/1/24. He voluntarily filed a concise statement of errors, raising seven enumerated issues. *See* Appellant's Statement of Errors, 5/18/24, 1-6; *see also* Pa.R.A.P. 1925(b). A few days later, he sought permission to amend his statement to add a challenge to the sufficiency of the evidence on the ground that the "alleged sex acts did not involve any communication or 'contact' for purposes of the statute." Appellant's Motion to Amend Statement of Errors, 5/22/24, Exhibit A. The trial court granted leave to file the amendment. Order, 5/28/24 (granting leave to file amendment). The amendment was filed. *See* Appellant's Amended Statement of Errors, 5/8/24.

Appellant raises five enumerated issues for our review, as follows:

I.      Whether the trial court erred in finding sufficient evidence that Appellant committed unlawful contact with a minor where Appellant did not engage in any contact or communications as defined in *Commonwealth v. Strunk*, 325 A.3d 530 (Pa. 2024), given that Appellant did not say or do anything to facilitate the alleged unlawful sex acts for which the jury also fully acquitted him.

II.     Whether the jury's acquittal for indecent assault precludes a conviction for unlawful contact with a minor where the jury was asked not whether the unlawful contact was for the purpose of committing indecent assault but instead whether an indecent assault was committed, thereby resulting in a conviction based on insufficient evidence because the jury found that the predicate offense of indecent assault did not occur by acquitting Appellant of that charge.

III.    Whether the trial court erred in giving a **Spencer** charge to a deadlocked jury and then *sua sponte* re-instructing the jury that the unlawful contact verdict and the indecent and aggravated indecent assault verdicts did not affect each other after first instructing the jury that they did affect each and relatedly, in denying Appellant's motion for a mistrial.

IV.    Whether the trial court erred in calculating Appellant's prior record score as [a repeat felony offender] given that Appellant's out-of-state and federal convictions did not have Pennsylvania equivalents and therefore should have been treated as one-point offenses.

V.    Whether the trial court erred in requiring Appellant to register as a sexually violent predator.

Appellant's Brief, 6-7 (suggested answers omitted).

In his first claim, Appellant asserts the evidence was insufficient for UCM "because the alleged sex acts did not involve any communication or 'contact' for purposes of the statute." Appellant's Brief, 23. He argues that **Strunk** "is dispositive" because it "significantly limited the reach of the unlawful contact statute." **Id.**, 24. Specifically, Appellant argues, **Strunk** held that the statute reflects "an emphasis on communicative acts over physical ones" and was "designed to make it illegal to contact minors to set up illegal sexual encounters." **Id.**, 26. Thus, **Strunk** reaffirmed this Court's ruling in **Commonwealth v. Leatherby**, 116 A.3d 73 (Pa. Super. 2005), which held that a conviction for unlawful contact "may not be based on evidence indicating only that the defendant committed an unlawful sex act," but must also include prior "verbal or nonverbal communication with the minor." Appellant's Brief, 26-27. Appellant argues that the required communication with the minor must "facilitate the commission of the assaults. Unlawful

contact criminalizes communicating with a minor to engage in a prohibited sex act; it does not mean committing the sex act itself." *Id.*, 29.

Appellant also relies on two recent unpublished memorandum decisions from this Court to argue a further limitation on the type of communication sufficient to sustain a conviction for UCM insofar as the communication must be sexual in nature. *See* Appellant's Reply, 1-4 (citing *Commonwealth v Martinez-Colon*, 2025 WL 1114705 (Pa. Super., filed Apr. 15, 2025) (3088 & 3099 EDA 2023) (unpublished memorandum decision), *appeal denied*, 2025 WL 2527170 (Pa., filed Sep. 3, 2025) (167 & 168 EAL 2025) (table) and *Commonwealth v. Fowler*, 2025 WL 52673 (Pa. Super., filed Jan. 9, 2025) (2038 EDA 2023) (unpublished memorandum decision), *appeal denied*, 342 A.3d 696 (Pa. 2025) (table)). He thereby asserts that the communication between himself and the complainant was not sufficient to sustain his conviction because "he did not say anything sexual" to her. Appellant's Reply, 5; Appellant's Brief, 28. He concludes that "[u]nlawful contact is arranging the opportunity to do the [unlawful] touching, and that was arranged by [the boyfriend's] mother, not Appellant" because she had arranged for Appellant to drive the complainant home. *Id.*, 32.

When reviewing a sufficiency claim, we construe "all the evidence admitted at trial in the light most favorable to the verdict winner[;]" the evidence is legally sufficient when it would "enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Brockman*, 167 A.3d 29, 38 (Pa. Super. 2017) (citation omitted). The

Commonwealth may prove an offense by means of wholly circumstantial evidence, and the evidence presented "need not preclude every possibility of innocence." ***Id***. (citation omitted). It is the job of the fact-finder to pass upon "the credibility of witnesses and the weight of the evidence produced," and the fact-finder "is free to believe all, part or none of the evidence." ***Id***. (citation omitted). "Whether evidence was properly admitted does not factor into our analysis, as sufficiency is not determined upon a diminished record." ***Commonwealth v. Bowens***, 265 A.3d 730, 741 (Pa. Super. 2021) (*en banc*) (emphasis in original).

Appellant asserts the evidence did not prove he had "direct or indirect communication" with the complainant for the purpose of engaging in a prohibited sexual activity, as required for a conviction of UCM. The UCM statute reads, in pertinent part:

> (a) **Offense defined.** –A person commits an offense if he is intentionally **in contact** with a minor ... **for the purpose of engaging in an activity prohibited under any of the following**, and either the person initiating the contact or the person being contacted is within the Commonwealth:
>
>> (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).
>
>> …
>
> (c) **Definitions.** –As used in this section, the following words and phrases shall have the meanings given to them in this subsection:
>
>> …
>
> "**Contacts.**" Direct or indirect contact or communication by any means, method or device, including contact or communication in person or through an agent or agency, through any print medium, the mails, a common carrier or communication common carrier,

any electronic communication system and any telecommunications, wire, computer or radio communications device or system.

18 Pa.C.S. § 6318(a)(1), (c) (emphasis supplied) (version of statute that applied at time of incident). Any communication, verbal or non-verbal, suffices so long as it is "designed to induce or otherwise further the sexual exploitation of children." *Strunk*, 325 A.3d at 543.[3]

Appellant argues the evidence was not sufficient to establish "contact," i.e., direct or indirect communication, with the complainant "for the purpose of engaging in an activity prohibited" by Chapter 31 of the Crimes Code. Specifically, he argues that: arranging the car ride would have been sufficient to support unlawful contact, but that was done by his sister, the mother of the complainant's boyfriend; and stopping the car was not sufficient, because he and the complainant "were already in contact at that point and going to the same place either way." Appellant's Brief, 32. Appellant's assertions do not address the direct communication he had with the complainant, both before

_____

[3] In *Strunk*, the Pennsylvania Supreme Court construed the version of the UCM statute in effect on the day of the incident here. *See* 325 A.3d at 534-535, 542-543. Since then, there have been two amendments that have altered slightly the wording or structure of Section 6318(a) but left the substantive effect in this case the same. Effective February 12, 2024, the word "he" in the first sentence of the definition of the offense was changed to a gender neutral "the person." *See* 2023, Dec. 14, P.L. 366, No.39, § 4. Effective August 26, 2025, subsection 6318(a)(1) was moved to a new subsection 6318(a)(1.2), though the wording was left unchanged, as part of an amendment to the statute to encompass additional categories of sexual offenses for which a communication that was made "for the purpose of engaging in" would suffice for a UCM offense. *See* 2025, June 27, P.L. 6, No. 5, § 2.

entering the car and while in the car. For that conversation, he argues only that **Strunk** and unpublished memoranda require that the conversation be sexual in nature and denies that he said anything sexual to the complainant. We disagree with Appellant's application of **Strunk** and the statute and find the evidence of his direct communication with the complainant was sufficient to sustain his conviction.

At trial, the complainant testified to direct communication between her and Appellant that caused her to sit in the front seat next to him:

> [THE PROSECUTOR:] When you first go to the car, what seat do you get into?
>
> [THE COMPLAINANT:] I tried to get into the backseat, but there was stuff back there[,] so he told me to sit up front with him.
>
> …
>
> [THE COMPLAINANT:] It was weird how he wanted me to sit up front with him when I could have sat in the back.
>
> [THE PROSECUTOR:]  Why was that weird?
>
> A. I don't know. It just gave me that weird feeling.

N.T. Trial, 9/19/23 - Trial, 49-50. And again, while under cross-examination:

> [DEFENSE COUNSEL:] And then [your boyfriend's] mother asks [Appellant] to drive you home?
>
> [THE COMPLAINANT]. Yes.
>
> Q. You're a day shy of 16, right?
>
> A. Yes.
>
> Q. You don't ride in the front of a car when you get in a car?
>
> A. No.
>
> Q. You always ride in the back?

A. Yes.

Q. Okay. So[,] you said there was stuff in the back, right?

A. Yes.

Q. And [Appellant] said to sit in the front?

A. Yes.

*Id.*, 68.

Appellant's spoken direction to the complainant caused her to feel "weird." *Id.*, 50. There was the suggestion of a ruse behind the statement, as the complainant said she "could have sat in the back," even though there was stuff in the back seat. *Id.*, 50, 68. Appellant's communication thereby caused the complainant to sit within arm's reach of him, contrary to her preference, and close enough for his subsequent attempts to touch and seduce her to succeed "without impediment." Trial Court Opinion, 11. Accordingly, viewed in the light most favorable to the Commonwealth, Appellant's direction to the complainant was sufficient to prove his direct communication with her "for the purpose of engaging in an activity prohibited" by the Crimes Code chapter defining sexual offenses. *See* 18 Pa.C.S § 6318(a), (c).

Our Supreme Court's recent decision in *Strunk* supports finding sufficient evidence here. In *Strunk*, the Supreme Court addressed a particular scenario involving an apparently sleeping victim, where there was no evidence of verbal or even physical communication apart from the sexual abuse itself. *See Strunk*, 325 A.3d at 532-533. "Following a review of the textual history of Section 6318, as well as dictionary definitions of the word 'contact' and the idiom 'come in contact with,' the Court concluded that 'the plain text does not

resolve the issue of whether the legislature used 'contact' to refer solely to communication" or whether it also intended the statute to encompass use of the "alternative definition of a physical touching." ***Commonwealth v. Clegg***, 342 A.3d 63, 66 (Pa. Super. 2025) (discussing and quoting ***Strunk***, 325 A.3d at 539). Reviewing the legislative history of the statute, the Supreme Court concluded that:

> the Superior Court has been consistently correct in recognizing the communicative focus of Section 6318. Section 6318 does not criminalize inappropriate touching of minors; other statutes accomplish that goal. … Any communication that is **intended to further the commission of one of the crimes** listed in Section 6318(a), whether it fits the definition of grooming or not, falls within the prohibition.

***Strunk***, 325 A.3d at 542 (emphasis supplied).

The Supreme Court continued, the element of "contact requires proof that the defendant engaged in some verbal or nonverbal communications with the minor for purposes of sexual contact beyond physically approaching the minor and the physical contact of the sexual assault itself," and found that "conflat[ing] verbal, written, and other forms of non-verbal communicative efforts to mean any form of physical contact" was erroneous. ***Strunk***, 325 A.3d at 542-543. Because the record before it was devoid of evidence of any communication, the Supreme Court found the evidence insufficient. ***See id.*** However, as the testimony quoted above demonstrates, here, there was evidence of direct communication by Appellant with the minor "for purposes of" engaging in the sexual exploitation of her.

Following **Strunk**, this Court reviewed a set of facts where the father sexually assaulted his sleeping daughter. She "awoke to someone touching her vagina." **Clegg,** 342 A.3d at 65. She "laid on her back in shock with her eyes closed until the touching stopped," and "[w]hen she opened her eyes, [Clegg] was there." **Id.** (internal citations omitted). The record also contained evidence that, before the assault, Clegg "'scream[ed]' at [his daughter] to come inside" their campsite trailer and then redirected her from the bed she had intended to sleep in "to sleep in the master bedroom with him and her baby brother." **Id.** She complied with her father's direction and "laid down in the bed with [Clegg] and her baby brother in between them." **Id.**

After discussing the Supreme Court's ruling in **Strunk**, this Court in **Clegg** ruled that the required "communication designed to induce or otherwise further the sexual exploitation of children," **Clegg**, 342 A.3d at 67 (quoting **Strunk**, 325 A.3d at 543), was proven by the evidence that Clegg "screamed at [the victim] to come inside the trailer and directed her to sleep in bed with him in the front bedroom." **Clegg**, 342 A.3d at 67. She complied with the direction and "was then sexually assaulted." **Id.** Because Clegg's "oral communication induced [his daughter] to sleep in a different location than she planned and was intended to further the commission of a crime, *i.e.*, rape of a minor" it was sufficient to sustain Clegg's conviction "under the statutory definitions provided in section 6318(a), and in accordance with our Supreme Court's holding in **Strunk**." **Id.**

Our decision in *Clegg*, applying *Strunk*, fully supports our conclusion that the evidence was sufficient in Appellant's case. As in *Clegg*, there was direct communication from Appellant to the complainant that induced her to change her location, contrary to her intention, to a location that made it easier for Appellant to commit a sexual offense. Appellant's direction to the complainant to sit in the front seat of his car was communication "designed to induce or otherwise further the sexual exploitation of [a minor]." *Clegg*, 342 A.3d at 67.

Appellant also contends that the requisite communication must be sexual in nature, but "he did not say anything sexual" to the complainant. *See* Appellant's Reply, 1-5. He cites two unpublished memorandum decisions in support. *Id.* We do not find these memoranda persuasive for the proposition Appellant asserts. *See* Pa.R.A.P. 126(b). In the first, *Martinez-Colon*, we found that the evidence was insufficient for UCM with one minor victim where the evidence was limited to the defendant "removing [that minor's] pajama bottoms while her feet were positioned on top of his shoulders," and causing her to wake up, but sufficient for UCM with the other minor victim, where, "on at least one occasion, [the defendant] instructed her to pretend that he was 'a boy that [she] like[d]'" while he performed oral sex on her. 2025 WL 2527170 at *4-*5. This is the same distinction discussed above; to sustain a conviction for unlawful contact, there must be **communication** for the purpose of engaging in a sexual offense of a child and not merely physical contact to commit the sexual offense.

Appellant contends that with respect to the child for which the evidence was found insufficient in ***Martinez-Colon***, the stated facts of the case indicate that the defendant "had locked her in various rooms, lived with her, and assaulted her repeatedly," so that it would be "safe to assume that the defendant must have had non-sexual conversations with" her. Appellant's Reply, 2. But that argument was never made in the appeal, as the Commonwealth conceded the evidence was insufficient for UCM where it was limited to the physical contact of the sexual assault itself, and the record evidence showed that the defendant "never said anything to [that minor victim] during the other occasions when he assaulted her." ***See id.*** at *4. Therefore, any inferred communication, particularly with unknown content, would have been too attenuated in time and place from the criminal incident to suffice for UCM.

In ***Fowler***, the defendant was charged with, *inter alia*, two counts of UCM in a case arising "from a years-long pattern of sexual abuse perpetrated by [him] against his half-sister … who was between three and eleven years-of-age at the time of the abuse." 2025 WL 52673 at *1. Of critical importance, "there was no evidence, other than the fact that the assaults occurred, that [the defendant] communicated with [the minor] … in furtherance of those assaults. Indeed, [the minor] testified that the [defendant] did not communicate with her in any way before or during the assaults." ***Id.*** at *11. This Court explained further that the "sole incident in which [the defendant] could be said to have communicated with [the minor] in furtherance of an

assault occurred when he told her 'this is what brothers and sisters do.'" ***Id.*** Because the victim did not testify to where or when the defendant made that statement, "it would be 'rank speculation' for the finder of fact to infer that [he] communicated those words during either of the relevant incidents" for which UCM was charged. ***Id.*** (quoting ***Strunk***, 325 A.3d at 543) (internal citation omitted). Therefore, we vacated Fowler's convictions for UCM. ***Id.*** at *11 (finding the evidence insufficient for UCM because "as in ***Strunk***, there was no evidence, other than the fact that the assaults occurred, that Fowler communicated with Victim … in furtherance of those assaults"). Plainly, the ***Fowler*** ruling was not contingent on "this is what brothers and sisters do" not being a sexual comment – it clearly was in the context – but rather on the lack of circumstantial evidence to reasonably infer when it was made in relation to the assaults charged and thereby whether it was a communication that **furthered** the commission of either of the sexual offenses at issue for the charge of UCM.

In contrast, here, Appellant's ruse to get the complainant in the front seat of the car, thereby facilitating sexual contact, furthered the underlying sexual offense. Appellant communicated with C.S. as the potential for a sexual assault was unfolding, caused her to relocate within arm's reach of him, and occurred within circumstances that permitted the inference that his intent was to sexually exploit her. Therefore, the evidence was sufficient to sustain Appellant's UCM conviction.

In his next claim, Appellant raises a second challenge to the sufficiency of the evidence, this time based on the jury verdict sheet and the trial court's answer to a jury question. *See* Appellant's Brief, 32-33. Appellant contends that the jury sheet arguably made aggravated indecent assault or indecent assault a predicate offense of UCM, because the interrogatory asked did the jury "find" aggravated indecent assault or indecent assault, suggesting that the jury had to find Appellant had completed either aggravated indecent assault or indecent assault in order to find him guilty of UCM. *See id.*, 33-34. He argues the jury's verdict that he was guilty of UCM was "incoherent and impossible" because it had "acquitted [him] of indecent assault but answered yes in response to the interrogatory which asked not whether he had the purpose of an indecent assault but whether there was one." *Id.*, 33. He argues that the "jury's acquittal on indecent assault precludes a conviction for [UCM] based on indecent assault because of the way this particular case was charged." *Id.*, 32. Based on his interpretation of the verdict sheet, he argues that the trial court correctly answered the jury's question, "[D]oes the decision of guilty or non-guilty on indecent or aggravated assault affect the decision on unlawful contact?," by saying "yes" initially, and incorrectly when it later changed its answer to "no." *Id.*, 36.

In support of a full discharge, Appellant contends that "inconsistent verdicts are not always permissible," citing cases in which predicate offenses or predicate facts in special interrogatories were not found but the lead charge was. *See* Appellant's Brief, 34-36. Because the "verdict slip asked whether

the jury found that there was an indecent assault" – and did not ask for whether the communication was for the purpose of indecent assault – Appellant asserts the verdict was "metaphysically impossible" and the acquittal of indecent assault "precluded a conviction of unlawful contact." *Id.*, 36.

Sufficiency is a matter of law. "A challenge to the sufficiency of the evidence 'presents a pure question of law and, as such, our standard of review is *de novo*, and our scope of review is plenary.'" **Commonwealth v. Akeley**, 320 A.3d 106, 110 (Pa. Super. 2024) (quoting **Commonwealth v. Santiago**, 294 A.3d 482, 485 (Pa. Super 2023)). In a series of cases our Supreme Court developed an "idiosyncratic sufficiency [claim] or grading challenge[]" based on specific language used in a few statutes, the way the specific offense was charged and the jury instructions, which combined could require a finding of guilt on a predicate offense as an element of the leading offense or grading of the offense. **Commonwealth v. Moore**, 103 A.3d 1240, 1247 (Pa. 2024).[4]

_____

[4] **See Commonwealth v. Magliocco**, 883 A.2d 479, 492 (Pa. 2005) (giving "the necessary effect of an actual acquittal of a crime in the admittedly unusual circumstance presented [], where that crime [terroristic threats] is both separately charged and prosecuted and is also a specific statutory element of another charged offense[,]" ethnic intimidation); **Commonwealth v. Baker-Myers**, 255 A.3d 223, 235 (Pa. 2021) ("we conclude … the language 'in violation of Chapter 31' is an essential element of a felony corruption of minors offense[,]" 18 Pa.C.S. § 6301(a)(1)(ii), and though the "Commonwealth is not required to" charge or secure a conviction for "a predicate Chapter 31 offense, where, as here, the jury is specifically instructed on the predicate offense [under Section 6301(a)(1)(ii)] … and the jury then
*(Footnote Continued Next Page)*

Appellant has shaped this sufficiency claim to fit within the ambit of that idiosyncratic claim.

However, the Supreme Court in the same line of cases made it absolutely clear that the UCM statute does not include a predicate offense conviction as an element of the UCM offense. In **Commonwealth v. Reed**, 9 A.3d 1138 (Pa. 2010), our Supreme Court explained:

> the Chapter 31 offenses are not predicate offenses for 18 Pa.C.S. § 6318. In other words, a defendant need not be successful in completing the purpose of his communication with a minor in order to be found guilty of § 6318(a). For example, the actual rape of a child is not an element of the crime under § 6318(a); rather a defendant is guilty if he *contacts* a minor for the purpose of engaging in that prohibited behavior. **See e.g., Commonwealth v. Morgan**, 913 A.2d 906, 910 (Pa. Super. 2006) (emphasis in original) ("[O]nce Appellant contacts or communicates with the minor *for the purpose of* engaging in the prohibited activity, the crime of unlawful contact with a minor has been completed."), **appeal denied**, 592 Pa. 788, 927 A.2d 623 (2007); **Commonwealth v. Evans**, 901 A.2d 528, 537 (Pa. Super. 2006) (defendant need not successfully complete purpose of contact or communication with minor; once contact or communication for purpose of engaging in prohibited activity occurs, "crime of unlawful contact with a minor has been completed."), **appeal denied**, [] 909 A.2d 303 ([Pa.] 2006). Thus, … a defendant need *not* be convicted of the substantive offense for which he contacted the minor. Indeed, he need not be separately charged with a Chapter 31 offense.

**Id.** at 1146 (emphasis and citations in original).

Because the UCM statute defines the offense of UCM as intentional contact with a minor "for the purpose of engaging in" any of the offenses

---

renders an acquittal on all such predicates, a conviction for felony corruption of minors cannot stand").

enumerated in Chapter 31, and not "committing" or "violating" any of the offenses in Chapter 31, there is no predicate conviction required for the UCM offense. **Reed**, 9 A.3d at 1146; **Commonwealth v. Aikens**, 168 A.3d 137, 144 (Pa. 2017) (UCM "does not require a conviction on the underlying offense for which a defendant contacts the minor victim").[5] Accordingly, we find that Appellant's second sufficiency claim fails because UCM is not one of the statutes that could be construed in an "idiosyncratic" manner to create a predicate conviction requirement.

The "idiosyncratic" claim that could be raised against a conviction for UCM is a "grading challenge." **Moore**, 103 A.3d at 1247; **see Aikens**, 168 A.3d at 138. This is a sentencing claim that Appellant has not raised in this appeal. The grade of Appellant's offense was determined to be a felony of the second degree. **See** Order of Sentence, 4/22/24. The default grade of a UCM conviction is a felony of the third degree. 18 Pa.C.S. § 6318(b). As the trial court graded the offense higher than the default provision, and the grading of an offense for sentencing may raise legality of sentence issues under **Apprendi v. New Jersey**, 530 U.S. 466 (2000), and because the grading challenge includes the same factors as the inapposite sufficiency challenge

---

[5] The Commonwealth also astutely argues that "the legislature is charged with the responsibility of defining elements of crimes," **Commonwealth v. Wright**, 494 A.2d 354, 357 (Pa. 1985), **aff'd sub nom. McMillan v. Pennsylvania**, 477 U.S. 79 (1986), and that elements of offenses are not subject to amendment – addition or subtraction – by the courts. **See Commonwealth v. Dixon**, 53 A.3d 839, 846 (Pa. Super. 2012) (Superior Court "is without authority to insert a word into a statutory provision where the legislature has failed to supply it") (citation omitted).

raised by Appellant, we will address the legality of the grading of the UCM offense *sua sponte*. **See**, **e.g.**, **Commonwealth v. Armolt**, 294 A.3d 364, 377-378 (Pa. 2023) (discussing both the power of an appellate court to *sua sponte* address a legality of sentence claim and when it should exercise that power).

As an initial matter, "when a court is faced with a possible **Apprendi** violation, whether of the due process or jury trial variety, the court is to undertake a harmless error analysis before ruling that the sentence is illegal." **Commonwealth v. Cruz**, 320 A.3d 1257, 1275–76 (Pa. Super. 2024) (*en banc*), **appeal denied**, 336 A.3d 249 (Pa. 2025). Here, the trial court imposed a term of two to five years' incarceration to be followed by three years' probation on the UCM charge. **See** Order of Sentence, 4/22/4. "When determining the lawful maximum allowable on a split sentence, the time originally imposed cannot exceed the statutory maximum." **Commonwealth v. Crump**, 995 A.2d 1280, 1283 (Pa. Super. 2010). A sentence is illegal where it "exceeds the statutory limits." **Commonwealth v. Archer**, 722 A.2d 203, 209 (Pa. Super. 1998) (*en banc*). The total sentencing exposure of eight years is within the maximum of ten years for a felony of the second degree but beyond the maximum of seven years for a felony of the third degree. **See** 18 Pa.C.S. § 1103. Accordingly, we cannot say that any error we may find would be harmless, and we will review the merits of a grading challenge to Appellant's UCM conviction as a felony of the second degree.

With respect to grading, the UCM statute provides:

**(b) Grading.**—A violation of subsection (a) is:

(1) an offense of the same grade and degree as the most serious underlying offense in subsection (a) [here, Chapter 31 offenses] for which the defendant contacted the minor; or

(2) a felony of the third degree;

whichever is greater.

18 Pa.C.S. § 6318(b). "[I]f a defendant unlawfully contacts a minor for purposes of engaging in any underlying …Chapter 31 offense, then pursuant to subsection 6318(b), the grading of the" UCM offense "is the same as the grading of the underlying offense." *Aikens*, 168 A.3d at 139.

In *Reed*, our Supreme Court held that "the default grading must apply because the fact-finder specifically determined that [Reed] did not commit the separately charged Chapter 31 offenses." *Reed*, 9 A.3d at 1148. Of particular importance to the *Reed* court was that, "because of [Reed's] acquittals on all of the underlying attempt crimes charged, the sentencing court **was required to guess which offense the defendant sought to commit** when he contacted the minor." *Aikens*, 168 A.3d at 139 (emphasis supplied). A "defendant need **not** be convicted of the substantive offense for which he contacted the minor." *Reed*, 9 A.3d at 1146 (emphasis in original). Nor must he be "separately charged with a Chapter 31 offense" but "when the Commonwealth does charge the defendant with a Chapter 31 offense, an acquittal is relevant for sentencing purposes under subsection 6318(b)." *Id.* The jury in *Reed* acquitted on charges of attempted rape and involuntary deviate sexual intercourse ("IDSI"), upon which the Commonwealth had relied

for grading. *Id.* at 1147 n.12. Because the trial court had to guess the purpose of the contact for the UCM conviction, the default grading provision of the UCM statute applied. *Id.* at 1147-48; *see also Aikens*, 168 A.3d at 143 ("the concern in *Reed* was that given the defendant's acquittals on multiple Chapter 31 attempt offenses of varying grades there was no way for the sentencing court to determine which offense he sought to commit when he contacted his minor victim").

In contrast, the Supreme Court found no ambiguity to the purpose of the contact supporting the UCM conviction in *Aikens*, even though, as in *Reed*, the Commonwealth had charged additional Chapter 31 offenses and the jury had acquitted Aikens on those charges. The difference was that "the trial court specifically instructed the jury that in order to find Appellant guilty of [UCM], it had to find beyond a reasonable doubt that the unlawful 'contact was for the purpose of engaging in an unlawful act'" of IDSI. *Aikens*, 168 A.3d at 143. Therefore, "in convicting [Aikens] of the offense of [UCM] the jury necessarily found as fact that [Aikens] contacted the minor victim in this case for the specific purpose of engaging in IDSI." *Id.*

Here, the trial court instructed the jury on UCM as follows:

To find the defendant guilty of [UCM], you must find that each of the following three elements have been proven beyond a reasonable doubt:

First, that the defendant was intentionally in contact with a minor. Second, that **the contact was for the purpose of engaging in unlawful acts, that is, either aggravated indecent assault of a child under 16 and/or indecent assault of a child under 16**. If you find that this element is proven beyond a reasonable

- 23 -

doubt, you must indicate on the verdict form which act or acts you have found to be so proven. I'll explain that more in a minute. Third, that either the defendant or the person being contacted is happening within the Commonwealth of Pennsylvania. Contact is considered any direct or indirect contact or communication by any means or method, and a minor is an individual under the age of 18.

…

So[,] on the verdict sheet you'll see that the four charges are listed here and beside those is where you [] write your verdict, guilty or not guilty. But for the last charge, [UCM], there is a space for guilty or not guilty. If you find not guilty of that charge, you can ignore what's below it. Okay. If you find guilty to that charge, then each of the questions underneath it must be answered. There is a spot for you [to] write yes or no as relates to those two questions.

N.T. Trial, 9/19/23, 203-204, 209 (emphasis supplied). These jury instructions are accurate and plainly do not require the jury to find that either aggravated indecent assault or indecent assault have been completed. Rather, the instruction tracks the wording of the UCM statute and informs the jury that it must find, beyond a reasonable doubt, that Appellant had the "purpose of engaging in" either of the two specified Chapter 31 offenses when he made contact, or communicated, with the minor complainant. The instruction here is similar to the one given in *Aikens*.

The difficulty in this case is the verdict sheet, because it could be construed to require a completed offense of aggravated indecent or indecent assault. It reads, in pertinent part, as follows:

| CHARGES | … | | VERDICT |
|---------|---|---|---------|

| … | … | … |
|---|---|---|
| Unlawful Contact with Minor—Sexual Offenses<br><br>- Do you find there was Aggravated Indecent Assault of a child under 16 years old?<br><br>- Do you find there was Indecent Assault of a child under 16 years old? | … | Guilty [handwritten]<br><br>Yes  or **No** [circled]<br><br>**Yes**  or No [circled] |

Verdict Sheet for CP-51-CR-0000146-2022 (emphasis supplied for circled responses).

While deliberating, the jury asked a question, "[D]oes the decision of guilty or non guilty on indecent or aggravated assault affect the decision on unlawful contact?" N.T. Trial, 9/20/23, 17. In discussing the jury's question with counsel, the trial court understood that the verdict sheet interrogatories could be erroneously understood by the jury to ask for a completed crime. N.T. Trial, 9/20/23, 22. Appellant argued that the jury was charged in a way that made the aggravated indecent and indecent assault "predicate offenses." *Id.*, 23. Ultimately, the court determined it would write "yes" onto the jury form and sent it back to the jury. *Id.*, 25-26. First thing the next morning, while the jury was still deliberating, the court informed counsel that after looking at "the case law" the answer to the jury's question is "very clearly 'no.'" N.T. Trial, 9/21/23, 3. It is "not a predicate offense. You could just charge unlawful contact." *Id.*, 4. Appellant argued that "if it affects gradation … the answer is yes." *Id.*, 5. The court cited both **Reed** and **Aikens** to defense

counsel. **Id.**, 6. It then informed the jury that it "made a mistake of law yesterday" and that it's corrected answer "has nothing to do … about my opinions about this case or anything else." **Id.**, 8-9. It read the question to the jury, explained it had said the answer was "Yes, yesterday," but that the "answer under the law is 'No.'" **Id.**, 9. It then crossed out the written answer on jury question form and wrote "No." **Id.**

With respect to the verdict sheet, Appellant argues that it narrowed the UCM offense by requiring a completed offense that we are now obligated to enforce. **See** Appellant's Reply, 8. In his view, the jury's answer of "yes" to indecent assault was contradicted by its finding of not guilty to the substantive offense. **See id.** He argues the not guilty finding must control because the court's instructions, including its initial answer to the jury's question, and the verdict slip "preclude" the inconsistent verdict. **See id.**

Whether the trial court's instructions, verdict sheet, or answers to jury questions require reversal is reviewed for an abuse of discretion. **See Commonwealth v. Sepulveda**, 55 A.3d 1108, 1141 (Pa. 2012) ("when reviewing jury instructions for error, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording") (internal quotation marks omitted); **Commonwealth v. Murray**, 248 A.3d 557, 577 (Pa. Super. 2021) (verdict sheets reviewed for abuse of discretion); **Commonwealth v. Davalos**, 779 A.2d 1190, 1195 (Pa. Super.

2001) ("scope of supplemental instructions … rests within the sound discretion of the trial judge").

Appellant's interpretation of the verdict sheet is plausible only if the verdict sheet and the court's first answer to the jury's question are considered in isolation. However, jury instructions must be read in their entirety. ***Commonwealth v. Prosdocimo***, 578 A.2d 1273, 1274 (Pa. 1990). "Error cannot be predicated on isolated excerpts of the charge, but it is the general effect of the charge that controls." ***Commonwealth. v. Pursell***, 724 A.2d 293, 314 (Pa. 1999).

Here, the main jury instructions explained that the second element of UCM was finding, beyond a reasonable doubt, that the communication was for the **purpose of engaging** in either aggravated indecent assault or indecent assault, and that if the jury so found, it would then mark the verdict sheet accordingly. ***See*** N.T. Trial, 9/19/23, 204. The court's instruction was clear and contrary to Appellant's argument. Although we agree that the verdict sheet could be interpreted to require the jury find a completed offense rather than Appellant's purpose, the trial court's corrected answer to the jury's question, particularly in light of its main instruction, clarified that the jury's duty was to find whether Appellant's purpose for the communication with a minor was to engage in one of the two specified offenses, and not the completion of either offense.

Because the jury instructions, verdict sheet, and answers to the jury's question do not create a direct line of unequivocal meaning, this case falls

between **Reed** and **Aikens**. The trial court's correction of its answer to the jury, though, stating that the jury's verdict of guilty or not guilty on the substantive offenses of aggravated indecent assault or indecent assault did not affect the jury's answers to the interrogatories on the verdict sheet makes this case far more like **Aikens**. As in **Aikens**, the trial court's correction of its answer to the jury's question combined with its charge on UCM specifically informed the jury that to find Appellant guilty of UCM the jury had to find beyond a reasonable doubt that Appellant's communication was "for the purpose of engaging in either aggravated indecent assault or indecent assault." N.T. Trial, 9/19/23, 204. Therefore, there was no ambiguity in the jury's verdict. The jury concluded, beyond a reasonable doubt, that Appellant's communication to the minor was for the purpose of engaging in indecent assault. **See Aikens**, 168 A.3d at 143.

In this case, indecent assault was charged as a misdemeanor of the second degree. **See** Information, CP-51-CR-0000146-2022; see also 18 Pa.C.S. §§ 3126(a)(1), (b)(1). The highest grade for any indecent assault is a felony of the third degree where the complainant was under 13 years of age and one of three other conditions is met. **See** 18 Pa.C.S. § 3126(b)(3). Under the UCM statute, therefore, the grading of Appellant's UCM offense is controlled by the default grading provision, making it a felony of the third degree. 18 Pa.C.S. § 6318(b). The eight-year imprisonment and probation sentence imposed exceeds the statutory maximum of seven years, **see** 18

Pa.C.S. § 1103(3), and therefore is illegal.[6] Accordingly, we vacate the sentence imposed and remand for resentencing on UCM as a felony of the third degree.

Appellant's third claim also relies on the incorrect assertion that the trial court properly answered the jury's question the first time. He alleges that the trial court abused its discretion by correcting the answer to the jury's question on whether the jury's verdict on aggravated indecent assault or indecent assault affected its UCM verdict **after** it was given a **Spencer** charge.[7] **See** Appellant's Brief, 36-37. He contends that, by correcting its answer, the trial court "unfairly coerced the jury into convicting." **Id.**, 37 & 40-45.

> The relevant scope and standard of review for a claim involving a court's instructions to a deadlocked jury is for an abuse of discretion. **Commonwealth v. Santiago**, 424 A.2d 870[, 873] (Pa. 1981). This Court will find an abuse of discretion regarding jury instructions where the jury verdict is the product of coercion or fatigue. **Commonwealth v. Greer**, 951 A.2d 346, 354–55 (2008). Relevant factors in this assessment include the charges at issue, the complexity of the issues, the amount of testimony to

---

[6] Appellant was convicted of UCM, which, under the Tier system for sexual offenses is a Tier II sexual offense. **See** 42 Pa.C.S. § 9799.14(c)(5). If he had been convicted of a Tier III offense, the sentence imposed would be lawful, because he would be subject to the mandatory term of consecutive probation of three years "in addition to any other lawful sentence issued by the court" applicable to a Tier III offense under subsection 9799.14(d). **See** 42 Pa.C.S. § 9718.5(a).

[7] "In **Commonwealth v. Spencer**, 275 A.2d 299, 338 (Pa. 1971), our Supreme Court addressed judicial interaction with deadlocked juries;" prohibited the use of one charge; and cited with approval the American Bar Association guidelines governing jury deadlock. **Commonwealth v. Marion**, 981 A.2d 230, 235 (Pa. Super. 2009).

consider, the length of the trial, the solemnity of the proceedings, and indications from the jury on the possibility of reaching a verdict. **Commonwealth v. Johnson**, 668 A.2d 97[, 108] (Pa. 1995).

**Commonwealth v. Marion**, 981 A.2d 230, 235 (Pa. Super. 2009) (internal citations cleaned up). In addition, the trial court's jury verdict sheet and its answers to jury questions are reviewed for an abuse of discretion. **See Murray**, 248 A.3d at 577; **Davalos**, 779 A.2d at 1195.

A repeating element in Appellant's argument is his contention that the court's first answer to the jury was correct, and therefore the court abused its discretion by giving the jury an incorrect answer on the law after it had given the **Spencer** charge. **See** Appellant's Brief, 37-39. As discussed above, the correct answer to the jury's question was the second one, "no." There were no predicate offenses for the jury to determine in consideration of Appellant's guilt of UCM, which was the clear import of the jury's question. The court's corrected answer was consistent with its main instruction on UCM. **See Aikens**, 168 A.3d at 144.

Appellant nonetheless argues "the verdicts on the assaults could still affect the verdict for unlawful contact because the jury's disbelief of the complainant about the assaults could be considered in deciding whether to believe the complainant about any unlawful contact." Appellant's Brief, 39. Appellant correctly notes that the jury's disbelief of the complainant could be considered in deciding on his guilt for UCM, but his assertion is unrelated to the jury's verdicts. Whether the jury may discredit a complainant's testimony

- 30 -

is within its discretion as the finder of fact. The "trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Dunkins***, 229 A.3d 622, 631 (Pa. Super. 2020) (quoting ***Commonwealth v. Leaner***, 202 A.3d 749, 768 (Pa. Super. 2019)). Contrary to Appellant's argument, a credibility determination may lead to a particular verdict, but a verdict does not force a jury to make a particular determination about a witness' credibility.

Similarly unavailing is Appellant's assertion that the trial court's "false in one, false in all" instruction supports the trial court's first answer to the jury. ***See*** Appellant's Brief, 39. The instruction does not apply to verdicts but to the jury's consideration of the weight and credibility of the testimony of the witness. ***See Commonwealth v. Vicens-Rodriguez***, 911 A.2d 116, 117 (Pa. Super. 2006) ("False in one, false in all" instruction "is a concept for assessing the weight of evidence" and "currently means that a jury may disregard the testimony of a witness if the jury believes that witness deliberately, or willfully and corruptly, testified falsely about a material issue").

Appellant's argument before the trial court, and mentioned on Reply, is that the jury's finding on the verdict sheet with respect to aggravated indecent assault and indecent assault affected its decision with respect to UCM because it goes to the grading of the UCM offense. ***See*** Appellant's Reply, 9. However, "punishment is a matter solely for the court and not for the jury to know or consider during its deliberations." ***Commonwealth v. Lucier***, 225 A.2d 890,

891 (Pa. 1967). Therefore, it was not an abuse of discretion for the court to decline to tell the jury how UCM would be graded, because the court could not tell the jury about it under the law. We find no abuse of discretion in the trial court's decision to correct its incorrect answer to the jury.

Appellant's argument, therefore, distills down to a complaint about the timing of the corrective answer, which was **after** the **Spencer** charge was given, on the grounds that doing so was coercive.[8] **See** Appellant's Brief, 40-45. Appellant contends that the correction was coercive because the trial court should have been aware that the jury was struggling with the UCM and corruption of a minor statutes, which, in his view, "are particularly complicated." **Id.**, 40. Then, "without receiving any new questions, the court re-instructed the jury that the answer to the question was actually no," and, according to Appellant, "the jury immediately convicted." **Id.** He argues that the court "should not have re-instructed a deadlocked jury that had already received a **Spencer** instruction." **Id.** Appellant cites cases for support in which the trial court was reversed because it directly or implicitly told the jury it must come to a particular verdict. **See id**., 41-45.

---

[8] Appellant does not allege that the charge was inaccurate or unnecessary. He also does not contend that a mistrial should have been given rather than the **Spencer** charge, as he requested in the trial court. **See** N.T. 9/20/23, 26-27. As the trial court explained, the jury could not come to a verdict on two of four charges, and it therefore gave a proper, non-coercive **Spencer** charge. **See** Trial Court Opinion, 15-16.

As an initial, but not insignificant, matter, the record does not support Appellant's assertion that the jury "immediately convicted." The trial notes of testimony show that the jury returned to the deliberation room at 10:39 a.m. after the court corrected its answer. *See* N.T. Trial, 9/21/23, 10. The court then recessed. *See id.* The jury returned to the courtroom at 12:11 p.m. to announce its verdict. *See id.*, 10-11. The jury had an additional hour or more to deliberate after the correction. We do not find evidence of coercion from the fact that the jury returned with its verdict an hour and a half after the court provided a correct answer on the law.

To obtain reversal from the trial court's correction on the law after giving a *Spencer* instruction, Appellant must show the jury's verdict was the product of coercion or fatigue. *See Greer,* 951 A.2d at 355. Critically, we find no error in the instruction the court gave to correct its answer to the jury question:

> Good morning everyone. You are probably wondering why I called you out here. … I made a mistake of law yesterday, and **I have found my mistake in giving you an answer to one of your questions that you sent out yesterday and I'm going to give you the correct answer as it relates to the law**. …[T]his has nothing to do, the answer I'm about to give you, about my opinions about this case or anything else. **It's just that as I've told you all along you're the judge of the facts. I am the judge of the law, and I gave you a wrong answer under the law yesterday. It's come to my attention, and I'm fixing it.** Okay.
>
> So[,] the question that you sent out yesterday was actually question No. 5, and I'm going to read it back to you. It was, "Does the decision of guilty or non-guilty on indecent or aggravated assault affect the decision on unlawful contact?"
>
> You might remember that … I wrote, "Answer: Yes," yesterday. The answer under the law is "No." So[,] I'm telling you that now

- 33 -

the answer is "No." Again, I'm going to say it again. **This has nothing to do with my opinion about any facts in this case. I just needed to give you the correct law.** All right. I am going to, on my copy of that question, I am going to actually X out where I wrote "Yes" and I'm going to write "No[.]" … I'll send it back to you in case you need to look at that again, but **I wanted to give you the correct law**.

Thank you very much for your time.

N.T. Trial, 9/21/23, 8-10 (emphasis supplied).

The trial court's explanation of why it was changing its answer – to give the jury the "correct law" or a "correct answer as it relates to the law" – was clear and consistent with its direction that the jury was the judge of the facts and the court the law. N.T. Trial, 9/21/23, 8, 10. The court further emphasized that the jury was responsible for judging the facts by explicitly stating that the change in its answer to the jury's question "has nothing to do with my opinion about any facts in this case … but I wanted to give you the correct law." ***Id.***, 9-10. We find the court's instructions made it clear to the jury that it should not infer from the timing of the court's correction on a point of law a reflection of the court's view of the facts. Jurors are presumed to follow the court's instructions. **See Commonwealth v. Speight**, 854 A.2d 450, 458 (Pa. 2004). Moreover, neither the correction nor the **Spencer** instruction given by the trial court insisted that the jury return a verdict, much less a specific verdict. There is no basis to find that this correction coerced the jury at all.[9]

_____

[9] Appellant raised no claim on appeal that the verdict was the result of fatigue.

Appellant relies primarily on **Commonwealth v. Montalvo**, 244 A.3d 359 (Pa. 2021), and argues that it "is similar to this case." Appellant's Brief, 41. We do not agree. In **Montalvo**, the trial court instruction reviewed was the reasonable doubt instruction in which the jury was told its "verdict must be guilty" where the "Commonwealth has **not** sustained its burden of proof." **Id.** at 364 (emphasis supplied). The **Montalvo** trial court's error was basic and fundamental. It also was repeated by the trial court in explaining the verdict sheet. **See id.** at 371. After being corrected the second time it made the error, the trial court said, "Now that was a Freudian slip," which compounded the error, because a Freudian slip is commonly understood to be "an unintended statement that reveals the true feelings of the speaker. In characterizing her own erroneous instruction to the jury as a 'Freudian slip,' the trial judge conveyed to the jury her belief that [the defendant] was guilty." **Id.** at 373. Thus, we concluded "the trial court's second erroneous instruction to the jury, and the trial judge's purported correction of the misstatement when brought to its attention by trial counsel, could only have served to prejudice [the defendant] even further." **Id.** at 372.

In contrast, here, the trial court made only one error, in its initial answer to the jury's question. It did not repeat that error, but corrected it clearly and properly the next day, while also denying that the correction had any relation to the court's views on the evidence in the case. We find no abuse of discretion in the court's decision to give the **Spencer** charge or to correct its erroneous initial answer to the jury's question after it had given the **Spencer** charge.

Most importantly, we find no basis to conclude the court's correction coerced the jury to arrive at its verdict.

In his fourth issue, Appellant alleges that the trial court incorrectly calculated his PRS as being repeat felony offender ("RFEL") rather than 4 points. *See* Appellant's Brief, 45. Appellant's claim "presents a challenge to the discretionary aspects of his sentence." *Commonwealth v. Spenny*, 128 A.3d 234, 241 (Pa. Super. 2015).[10]

Discretionary sentencing claims are not appealable as of right. *Commonwealth v. Leatherby*, 116 A.3d 73, 83 (Pa. Super. 2015).

> Rather, an appellant challenging the sentencing court's discretion must invoke this Court's jurisdiction by (1) filing a timely notice of appeal; (2) properly preserving the issue at sentencing or in a motion to reconsider and modify the sentence; (3) complying with Pa.R.A.P. 2119(f), which requires a separate section of the brief setting forth a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence; and (4) presenting a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S. § 9781(b), or sentencing norms. An appellant must satisfy all four requirements.

*Commonwealth v. Miller*, 275 A.3d 530, 534 (Pa. Super. 2022) (internal citations omitted), *appeal denied*, 302 A.2d 626 (Pa. 2023).

Appellant complied with the first three requirements. We therefore turn to whether he established a substantial question for review. We make the determination on a case-by-case basis. *See Commonwealth v. Crawford*,

_____

[10] Our decision to vacate the sentence and remand for resentencing on UCM as a felony of the third degree does not relieve us of having to address this issue as it will be relevant at the new sentencing hearing.

257 A.3d 75, 78 (Pa. Super. 2021). "We cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists." *Id.* at 78-79 (quoting *Commonwealth v. Radecki*, 180 A.3d 441, 468 (Pa. Super. 2018)) (brackets omitted). A substantial question exists where an appellant sets forth a plausible argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process. *See Commonwealth v. Hartle*, 894 A.2d 800, 805 (Pa. Super. 2006).

In his statement of reasons for allowing an appeal, Appellant asserts that "a claim relating to the proper calculation of the [S]entencing [G]uidelines presents a substantial question." Appellant's Brief, 21. We have held that a "claim that the sentencing court misapplied the Sentencing Guidelines presents a substantial question." *Commonwealth v. Johnson*, 758 A.2d 1214, 1216 (Pa. Super. 2000). We therefore find that Appellant's assertion that the trial court erroneously computed his prior record score raises a substantial question because it leads to an erroneous calculation of the guideline range.[11]

_____

[11] Although we conclude Appellant raises a substantial question, he cites authority that does not support his assertion. *See* Appellant's Brief, 21. Rather, *Commonwealth v. Beatty*, 227 A.3d 1277, 1287 (Pa. Super. 1999), holds that inadequate reasons for imposing a sentence outside the sentencing guideline ranges raises a substantial question. *Beatty* does not address whether miscalculation of the guidelines is a substantial question. *See id.*

We now turn to a substantive review of the sentencing court's exercise of its discretion. Our standard of review is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Johnson*, 125 A.3d 822, 826 (Pa. Super. 2015) (citations omitted). Additionally, our review is confined by statutory mandate. *See Johnson*, 125 A.3d at 826-27. On this claim, we may only vacate and remand to the sentencing court with instructions if we find that "the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously." 42 Pa.C.S. § 9781(c)(1).

When sentencing a criminal defendant convicted of a felony and/or misdemeanor, the trial court must consider, *inter alia*, the Sentencing Guidelines adopted by the Pennsylvania Commission on Sentencing. *See* 42 Pa.C.S.A. § 9721(b); 204 Pa.Code § 303.1(a).

> The prior record score is based on the number and type of prior convictions the defendant has on his or her criminal record. 204 Pa.Code § 303.4(a). Each prior conviction is given a point value ranging between one and four points. *See generally* 204 Pa. Code §§ 303.7, 303.15. Sections 303.7 and 303.15 set forth the point value for every Pennsylvania criminal offense, but generally speaking (with some exceptions not relevant here), first-degree felony ("F1") convictions are either three- or four-point offenses, F2 convictions are two-point offenses and F3 convictions are one-point offenses. *See id.*

A higher prior record score yields a higher guideline sentence, up to a maximum of five points. 204 Pa. Code §§ 303.4(a)(3), 303.16(a). A defendant who has prior convictions of F1s and F2s that total six or more points is separately classified as a RFEL, which further increases the guideline sentence. 204 Pa. Code §§ 303.4(a)(2), 303.16(a)[…]

…

A prior conviction from another state court, federal court, or foreign jurisdiction "is scored as a conviction for the current equivalent Pennsylvania offense." 204 Pa.Code § 303.8(f)(1). **If there is no current Pennsylvania equivalent, the trial court must base the grading of the crime on the maximum sentence allowed**; if the grade of the prior felony conviction is unknown, it must be treated as an F3. 204 Pa. Code § 303.8(d)(2), (f)(3).

*Spenny,* 128 A.3d at 242 (emphasis supplied). "An equivalent offense is that which is substantially identical in nature and definition as the out-of-state or federal offense when compared with Pennsylvania offense." *Commonwealth v. Bolden*, 532 A.2d 1172, 1176 (Pa. Super. 1987); *see also Commonwealth v. Shaw*, 744 A.2d 739, 743 (Pa. 2000) ("formally adopt[ing]" the approach to determining equivalent statutes set out in *Bolden*).

Appellant argues that he "should receive a new sentencing hearing because the trial court erred in calculating his PRS." Appellant's Brief, 45. Specifically, Appellant argues that his 2006 federal Hobbs act robbery under 18 U.S.C. § 1951(a), and his 1999 Connecticut attempted first-degree robbery conviction under Conn. Gen. Stat. § 53a-134, both of which involved the possession of a firearm, do not have any Pennsylvania equivalents. *See* Appellant's Brief, 45.

Appellant compares the Hobbs Act offense to the Arizona statute reviewed in *Spenny* and argues that this Court held that the Arizona armed robbery statute criminalizes the possession of a firearm in the course of a robbery, whereas the relevant Pennsylvania statutes, for either robbery or robbery of a financial institution are not equivalent because "Pennsylvania had no statute which specifically punishes the possession of a deadly weapon during a robbery." Appellant's Brief, 48. "Instead, the Pennsylvania robbery statute criminalizes inflicting or threatening serious bodily injury during a robbery." *Id.* He also argues that the "*Spenny* Court found that because the sentencing court could impose a sentence above the maximum sentence if it found certain aggravating factors, Arizona's sentencing provisions were not consistent with Pennsylvania's laws." *Id.*, 48. He asserts the federal offense has similar features to the Arizona sentencing scheme. *See id.*, 53. He then argues that a Connecticut robbery offense is "based on preventing or overcoming resistance, which is not an element of the Pennsylvania robbery statute," and the range of possible sentences is greater than under the Pennsylvania statute. *See id.*, 54-56. Appellant concludes that each foreign offense had to be scored under the default provision, resulting in a PRS of four rather than RFEL. *See id.*, 56.

The trial court explained in its opinion that "[f]or the purposes of calculating the PRS, the presentence investigator determined that both [the Connecticut armed robbery statute and the federal Hobbs Act] were equivalent to the Pennsylvania offense of Attempted Robbery — Threaten Serious Bodily

Injury (F1) (Inchoate to 4-point Offense)." Trial Court Opinion, 20. The trial

court continues:

> Comparing first the Pennsylvania and Connecticut statutes, both penalize the infliction or threat of serious bodily injury during a theft or attempted theft. In Connecticut, first, second, and third degree robbery each get separate code sections, representing Class B, C, and D felonies, respectively. Conn. Gen. Stat. § 53a-133-135. In Pennsylvania, first, second, and third degree felony robberies all fall under the same code section. 18 Pa.C.S. § 3701(b)(1) ([defining the grade of the offense under each subsection; robbery subsection (a)(ii) is an F1]). While the Connecticut statute specifically bars threats involving the use of a weapon, the Pennsylvania statute forbids, as an F1, the threat of serious bodily injury, which can include threats involving the use of a weapon. 18 Pa.C.S. § 3701(a)(1)(ii). Considering the elements of these two statutes, it is clear they are "substantially identical in nature and definition." ***Bolden***, 532 A.2d at 1177. As such, F1 Robbery is the appropriate equivalent under Pennsylvania law, and the Connecticut robbery conviction was properly scored as four points.

Trial Court Opinion, 21. Upon independent review, we disagree.

We are not persuaded that a Connecticut robbery of the first-degree is

substantially similar to a Pennsylvania robbery graded as an F1.[12] However,

_____

[12] We have analyzed the elements of the Connecticut statutes for criminal attempt, robbery and robbery in the first degree: Class B felony. ***See*** Conn. Gen. Stat. §§ 53a-49, 53a-133, 53a-134, respectively. They appear, for the most part, substantially similar with the Pennsylvania offense of attempted robbery as an F1. However, there appears at least one way in which the Connecticut statute might encompass conduct not covered by 18 Pa.C.S. § 3701(a)(i-ii). We discern that a person could commit a Class B felony in Connecticut if "in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person" to accomplish the larceny while "armed with a deadly weapon." Conn. Gen. Stat. §§ 53a-133, 53a-134(a)(2). Whether being "armed with a deadly weapon" means brandishing or showing the weapon so to put the victim "in fear of serious

*(Footnote Continued Next Page)*

- 41 -

we may affirm the trial court on any lawful basis. *See Commonwealth v. Diaz*, 183 A.3d 417, 421 (Pa. Super. 2018) ("an appellate court is not bound by the rationale of the trial court and may affirm on any basis if the record supports it"). We observe that the Connecticut and Pennsylvania offenses have the same statutory maximum of 20 years imprisonment for an F1 and therefore the Connecticut offense is a four point offense in calculating the PRS. *See Spenny*, 128 A.3d at 242 ("if there is no current Pennsylvania equivalent, the trial court must base the grading of the crime on the maximum sentence allowed").

The grading of a foreign offense as represented by the statutory maximum is an alternative way to determine the prior record points for an out-of-state offense when there is no equivalent Pennsylvania offense. *See* 204 Pa. Code § 303.8(f)(3) ("When there is no current equivalent Pennsylvania offense, determine the current equivalent Pennsylvania grade of the offense based on the maximum sentence permitted, and then apply § 303.8(d)(2)"); *id.* at § 303.8(d)(2) ("When there is no current equivalent Pennsylvania offense, prior convictions or adjudications of delinquency are scored under § 303.7 **based on the grade of the offense**") (emphasis supplied). Section 303.7 incorporates, as a four-point offense, all crimes of violence as defined by the statute for sentencing offenders of multiple crimes

_____

bodily injury," 18 Pa.C.S. § 3701(a)(ii), or anything more than mere possession, has not been briefed by either party. Therefore, we cannot, on this record, find that the statutes are substantially similar.

- 42 -

of violence, which includes robbery under 18 Pa.C.S. § 3701(a)(1)(i), (ii) or (iii). *See* 204 Pa. Code § 303.7(a)(1); *see also* 42 Pa.C.S. § 9714(g) (identifying crimes of violence). Robbery in the first degree is classified as a Grade B felony in Connecticut. *See* Conn. Gen. Stat. § 53a-134. A Class B felony of the sort committed by Appellant has a maximum term of imprisonment of 20 years. *See* Conn. Gen. Stat. § 53a-35a ("For a class B felony other than manslaughter in the first degree with a firearm …, a term not less than one year nor more than twenty years"). Therefore, the appropriate grade for the Connecticut offense is the equivalent grade of an F1 in Pennsylvania.

Our analysis is similar for Appellant's federal Hobbs Act conviction under 18 U.S.C. § 1951(a), in that we rely on the maximum term of imprisonment to obtain a grade and thereby the number of points to calculate Appellant's PRS. The federal statute provides, in relevant part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, **by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property** in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
>
> (b) As used in this section--
>
>> (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, **against his will,** by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a

> relative or member of his family or of anyone in his company at the time of the taking or obtaining.
>
> (2) The term "extortion" means the obtaining of property from another, **with his consent,** induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951 (emphasis supplied).

The federal statute encompasses both robbery and extortion, unlike the Crimes Code, which separates the offenses into two distinct crimes. *See* 18 Pa.C.S. §§ 3701 (robbery), 3923 (theft by extortion). Therefore, the breadth of the federal Hobbs Act is far greater than our Commonwealth's robbery statute and, for that reason, is not substantially identical for the purposes of calculating the PRS.

However, the federal statute also provides the maximum sentence available, which is 20 years. *See* 18 U.S.C. § 1951(a). As with the Connecticut robbery offense, this is identical to a Pennsylvania F1. Therefore, the Hobbs Act offense was properly graded as an F1 and calculated as a four point offense. *See* 204 Pa. Code § 303.7(a)(1), *id.* at § 303.8(d)(2). Thus, we agree with the trial court's conclusion that because Appellant had "two prior four-point F1 robberies on his record, Appellant's PRS score was correctly calculated to be RFEL." Trial Court Opinion, 22. Appellant is due no relief on this issue.

In his final claim, Appellant argues that the trial court erred by designating him to be a sexually violent predator ("SVP"). He argues that the report prepared by the Sexual Offender Assessment Board ("SOAB") did not

support the finding in four ways: (1) he asserts the report was based on incomplete information, specifically, the expert did not interview him and answered inconsistently on whether he read the trial transcripts; (2) the report based its conclusions on the allegations in the complaint and not what the jury found or could have found, and did not include any available information favorable to Appellant; (3) the factors cited by the expert were based almost entirely on Appellant's criminal history and parole records from the 1990s when he was a juvenile; and (4) the "answer to virtually every prong of the SVP analysis was no" and thereby weighed against finding SVP status. Appellant's Brief, 56-59. Appellant also argues that the report "hinged on a counselor suggesting that Appellant may have had antisocial tendencies twenty years ago" and the court did not take into consideration any information presented that "would have benefitted Appellant." *Id.*, 60-61. He asks this Court to "reverse the SVP determination." *Id.*, 61.

> A challenge to a trial court's SVP designation presents a challenge to the sufficiency of the evidence for which our standard of review is *de novo* and our scope of review is plenary. A challenge to the sufficiency of the evidence to support an SVP designation requires the reviewing court to accept the undiminished record of the case in the light most favorable to the Commonwealth. The reviewing court must examine all of the Commonwealth's evidence without consideration of its admissibility. A successful sufficiency challenge can lead to an outright grant of relief such as a reversal of the SVP designation … We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

*Commonwealth v. Aumick*, 297 A.3d 770, 776–77 (Pa. Super. 2023) (*en banc*) (internal citations, quotation marks and footnote omitted).

In addition, to prove the element of mental abnormality or personality disorder, the Commonwealth must prove that the defendant has a congenital or acquired condition that affects his emotional or volitional capacity in a manner that predisposes him to commit criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons. *See Commonwealth v. Hollingshead*, 111 A.3d 186, 189-190 (Pa. Super. 2015); *see also* 42 Pa.C.S. § 9799.12 (defining, *inter alia*, "sexually violent predator" and "mental abnormality"). The Commonwealth also must show that the defendant's conduct was predatory. *See Commonwealth v. Lawrence*, 313 A.3d 265, 280 (Pa. Super. 2024); *Hollingshead*, 111 A.3d at 190. "Predatory" conduct is defined as an "act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." 42 Pa.C.S. § 9799.12.

> The trial court explains its ruling as follows:

> Under the Sexual Offender Registration and Notification Act (hereinafter "SORNA"), an individual convicted of a sexually violent offense must be evaluated by the [SOAB] to determine if they are a sexually violent predator. 42 Pa.C.S. § 9799.24(a). An SVP is an individual who has "a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses." *Commonwealth v. Butler*, 226 A.3d 972, 992 (Pa. 2020). The SOAB conducts a 14-factor analysis to determine if the individual should be designated an SVP. 42 Pa.C.S. § 9799.24(b). The SOAB then submits a report to the prosecuting authority. 42 Pa.C.S. § 9799.24(d). Then, an SVP

hearing is held, and the court determines whether the Commonwealth has proved by clear and convincing evidence that the individual is an SVP. 42 Pa.C.S. § 9799.24(e)(3).

After an SVP hearing, the trial court determined that Appellant is an SVP. [*See* N.T. Sentencing, 4/19/24, 7-67]. SORNA defines a sexually violent offense as an offense codified in section 9799.14 as a Tier I, II, or III sexual offense committed on or after December 20, 2012. [*Aumick*, 297 A.3d at 777.] Here, Appellant was convicted of [UCM], a Tier II sexual offense. Accordingly, Appellant was evaluated by the SOAB. The SOAB conducted the 14- factor analysis, which includes analyzing the victim's age, the nature of the sexual contact, Appellant's lengthy criminal history, and his risk of reoffending. The SOAB reviewed multiple records discussing his medical and mental health history. In so doing, the SOAB determined that he meets the diagnostic criteria for antisocial personality disorder, a lifetime disorder that makes the individual likely to reoffend. SOAB Report at 12. The SOAB, as required by statute, took into consideration the 14-factors and Appellant's diagnosis of antisocial personality disorder to determine that Appellant met the criteria of an SVP. [*See* N.T. Sentencing, 4/19/24, 20-23]. Accordingly, the trial court found the Commonwealth proved by clear and convincing evidence that Appellant is an SVP.

Trial Court Opinion, 22-23.

Appellant's argument nominally alleges there is insufficient evidence that he met the SVP requirements, but presents no relevant argument that the evidence was legally insufficient in that the Commonwealth failed to present evidence of an element of the SVP designation or failed to carry its burden by clear and convincing evidence. Instead, Appellant's challenge goes to the weight of the evidence, that is, whether the trial court **should** have credited the Commonwealth's evidence over his own. Critically, before this Court, Appellant argues each of the 14-factors and asserts that the answer "to virtually every prong" weighed against finding that he met the

- 47 -

requirements for SVP. Appellant's Brief, 58-59. This analysis contradicts the Supreme Court's direction that these factors do not "operate as a checklist where each factor weighs, in some absolute fashion, either for or against an SVP classification." *Commonwealth v. Meals*, 912 A.2d 213, 222 (Pa. 2006). As the Supreme Court explained, "counsel [is] free to argue to the trial court that the expert's responses to these lines of examination were not credible or were unpersuasive, and that the expert's opinions and ultimate conclusion should therefore be rejected." *Id.* "However, once the court" makes "its SVP determination, the … appellate task requires construing the evidence in the light most favorable to the party which prevailed." *Id.* Appellant's argument, therefore, asks us to reweigh the evidence in his favor, which we cannot do.[13]

Rather than rely on Appellant's critiques, we must view the evidence presented in the light most favorable to the prevailing party. *See Hollingshead*, 111 A.3d at 194. Based on records available for the expert to review, the expert concluded that Appellant met "the diagnostic criteria for Antisocial Personality Disorder which is considered a congenital or acquired condition[,]' and is "a lifetime disorder." SOAB Report, 12. Moreover, that Appellant had "a very significant history of violent antisocial behavior since

---

[13] Appellant also contends that the SOAB expert "did not interview [him]." Appellant's Brief, 56. The expert did not interview Appellant here because Appellant "would not participate in the assessment." SOAB Report, 2. As the report explained, "[t]he absence of an interview does not preclude the [SOAB member's] ability to assess [Appellant's] behavior throughout history for characteristics similar or dissimilar to the criteria set forth in statue defining a [SVP]." *Id.*

age 15," the expert opined that several characteristics of the offense, [e.g., the complainant was a stranger, Appellant had a lack of concern for others, impulsiveness, each of which indicated an] increased risk for reoffending," which is "significantly greater than other individuals convicted of similar sex offenses." *Id.*, 11-12. Thus, the record evidence was sufficient to prove Appellant has a congenital or acquired condition predisposing him to commit criminal sexual acts to a degree that makes him a menace to the health and safety of others, and that his conduct was predatory. Accordingly, we ascertain no error in the trial court's determination that Appellant met the requirements for SVP status.

Conviction, SVP status and PRS affirmed. Judgment of sentence vacated. Case remanded for resentencing of UCM conviction as a felony of the third degree. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/22/2025